Rudy A. PULIDO, et al., Plaintiffs,

v.

Lauro F. CAVAZOS, Secretary of the United States Department of Education, et al., Defendants,

and

Ronald and Theresa Jones, et al., Intervenors–Defendants.

No. 85–1096–CV–W–8.

United States District Court, W.D. Missouri, W.D.

Dec. 21, 1989.

**576**

Lee Boothby, Boothby, Ziprick & Zingst, Berrien Springs, Mich., William T. Smith, III, John K. Power, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for plaintiffs.

Judith Strong, Asst. U.S. Atty., Kansas City, Mo., Theodore Hirt, Stuart Licht, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

Paul Donnelly, Stinson Mag & Fizzell, Kansas City, Mo., William R. Stein, John C. Moylan, Daniel Wolf, Hughes, Hubbard & Reed, Washington, D.C., for intervenors-defendants.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

██ Plaintiffs filed this lawsuit challenging certain provisions of Chapter 1 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. § 2701 *et seq.* (hereinafter referred to as Title I).[1] Title I authorizes the expenditure of money to fund remedial educational services to students in certain low income areas. Plaintiffs raise questions which can be divided into four general categories: whether those provisions of the statute authorizing the Secretary to bypass the local educational authority (LEA) are constitutional and should be continued in force; whether the method of allocating the cost of the bypass and the costs incurred because of the Supreme Court's decision in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), violate the first amendment's[2] prohibition against the establishment of religion; whether the use of mobile and/or portable classroom units on parochial school property to provide services to students which are provided to public school students in their own building violates the first amendment's establishment clause; and whether the placement of mobile units on public property located near parochial schools violates the first amendment's establishment clause.[3] Plaintiffs seek a declaration from this court that the above practices and policies are unconstitutional and that defendants be enjoined from further enforcement of these practices and policies.

A brief review of the procedural history of this case is necessary to understand the four issues currently before the court. Plaintiffs filed this action in 1985. Shortly before trial in 1986, the court dismissed nine of the eleven plaintiffs finding that, as taxpayers, they lacked standing to bring the complaint. After hearing testimony offered on behalf of the remaining two plaintiffs, the court granted defendants' post-trial motion to dismiss those two plaintiffs on the grounds that one plaintiff lacked standing and that the claims of the other plaintiff had become moot. Plaintiffs appealed each of these dismissals to the Unit-

---

1. The statute was recodified as part of the Augustus F. Hawkins/Robert T. Stafford Elementary and Secondary School Improvement Act of 1988, P.L. 100–297, signed into law on April 28, 1988. The provisions of the statute used to appear at 20 U.S.C. § 3801 *et seq.* but the court will refer to the new statutory citations throughout this order.

2. The Supreme Court has found that the first amendment is applicable to the states through the fourteenth amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

3. The court recognizes that plaintiffs' complaint purports to state a number of other causes of action. After carefully reviewing the complaint, the court concludes that plaintiffs have standing only as to these four issues as just stated, all of which relate to the first amendment's establishment clause, and that the other portions of plaintiffs' complaint, such as the fifth amendment claims, are not properly before this court since taxpayers have standing only to raise establishment clause challenges. *See Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 2579, 101 L.Ed.2d 520 (1988).

ed States Court of Appeals for the Eighth Circuit, which affirmed the majority of this court's order. *See Pulido v. Bennett*, 848 F.2d 880 (8th Cir.1988).[4]

Shortly after the Eighth Circuit issued its decision the Supreme Court, in *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), held that taxpayers have standing to bring first amendment establishment clause challenges to programs such as Title I. As a result, on rehearing, the Eighth Circuit vacated its original order and remanded the case to this court noting that the federal taxpayers had standing under *Kendrick* and should be reinstated. *See Pulido v. Bennett*, 860 F.2d 296 (8th Cir.1988). After the mandate was issued and the case remanded to this court the parties engaged in limited additional discovery. Defendants and intervenor-defendants (hereinafter collectively referred to as defendants) filed a motion for summary judgment, which this court denied on June 22, 1989. The court held three additional days of testimony, to supplement the testimony taken in 1986, and then ordered post-trial briefing. That briefing has now been completed and, therefore, the case is once again properly before this court for decision.

## I. *Previous Title I Litigation*

The question of the constitutionality of providing Title I services to nonsectarian students in Missouri was first addressed in *Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974). In that case the Supreme Court held that Missouri was "not obligated by Title I to provide on-the-premises instruction" to students in private schools. *Id.* at 419, 94 S.Ct. at 2284. The Supreme Court remanded the case to the Eighth Circuit which recognized that, as a result of the Supreme Court's decision, the

cost of providing "comparable services" to public and nonpublic school students might well result in more money being spent on parochial school students than on students in public schools. *Barrera v. Wheeler*, 531 F.2d 402, 407 (8th Cir.1976). The court noted that "the dollar amount allocated [per pupil] can serve only as an indicia of compliance or noncompliance" with the Title I mandate of providing comparable services to parochial school students. *Id.* (quoting *Barrera v. Wheeler*, 475 F.2d 1338, 1347 (8th Cir.1973)).

Despite the Supreme Court's holding in *Wheeler* that such a practice was not necessary, Missouri continued to provide on-the-premise instruction to some parochial school students in Missouri. This practice, *inter alia*, was challenged in *Wamble v. Bell*, 598 F.Supp. 1356 (W.D.Mo.1984). In *Wamble* this court held that providing "on-premise remedial instruction by government subsidized teachers" at private schools violated the first amendment's establishment clause. *Id.* at 1371. In addition, the court held that the Secretary's decision to invoke the bypass provision[5] of the Title I statute was constitutional. *Id.* at 1365. Shortly after this court issued its decision in *Wamble* the Supreme Court made a similar ruling in *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). In *Felton* the Court held that New York's practice of providing Title I services in church-affiliated schools violated the first amendment's establishment clause. In making this decision the court found that New York's method of implementing Title I was unconstitutional for two reasons: because it required that aid be "provided in a pervasively sectarian environment" and because, since the "assistance is

---

**4.** The Eighth Circuit reversed that portion of this court's order finding that Secretary of Education Bennett was not entitled to qualified immunity. 848 F.2d at 889. That portion of the Eighth Circuit's opinion was unchanged after rehearing.

**5.** In 1974 Congress amended Title I to allow the Secretary of Education to bypass state and local educational authorities, and to award contracts to other, independent agencies for the provision of Title I services, if the Secretary found that the

state and local authorities were unable to provide the necessary services. *See* 20 U.S.C. § 2727(b) (statute authorizes bypass if the local educational agency is prohibited by law from providing Title I services or if the Secretary determines that the LEA "has substantially failed to provide for the participation on an equitable basis of educationally deprived children enrolled in private elementary and secondary schools....").

provided in the form of teachers, ongoing inspection is required to ensure the absence of a religious message." 473 U.S. at 412, 105 S.Ct. at 3238. In reaching this decision the court noted that, after *Felton,* Title I remedial instruction could be provided to students in parochial schools "only if such instruction ... [is] afforded at a neutral site off the premises of the religious school." *Id.* at 421, 105 S.Ct. at 3242 (O'Connor, J., dissenting) (quoting *Felton v. Aguilar,* 739 F.2d 48, 64 (2d Cir.1984)). Justice O'Connor specifically noted that the use of "portable classrooms just over the edge of school property" could "possibly" be a way of providing Title I services to parochial school children. *Id.* 473 U.S. at 430–31, 105 S.Ct. at 3247–48 (O'Connor, J., dissenting).

The majority of claims advanced by plaintiffs in the instant case arise as a result of the Supreme Court's decision in *Felton.* Specifically, plaintiffs challenge the Secretary's decision to take the costs of complying with the Supreme Court's decision in *Felton* "off the top" of the state's Title I monetary allocation. In addition, plaintiffs challenge the defendants' decision to comply with the Supreme Court's holding in *Felton* by providing Title I services in portable units located on public property directly outside of the parochial schools or, in some instances, in mobile units actually on the parochial school property. Thus, this court must essentially determine whether the manner in which federal and local officers have chosen to implement Title I since the Supreme Court's decision in *Felton* passes constitutional muster.

## II. *Bypass Provisions*

██ In both their complaint and their post-trial briefs plaintiffs challenge the existence and operation of the bypass procedure in Missouri. In both documents plaintiffs apparently argue that the decision to invoke the bypass in Missouri violates the establishment clause of the first amendment by creating an impermissible link between the parochial schools and the state. Plaintiffs argue that there is no need to continue the bypass in Missouri and that the state could directly provide Title I services to parochial school students. As defendants note, this court addressed virtually these same issues in *Wamble v. Bell.* At that time, the court found that the Secretary of the Department of Education "acted rationally and within the scope of his authority" when deciding to invoke the bypass in Missouri. 598 F.Supp. at 1365. After reviewing the operation of the bypass in Missouri the court concluded that the Secretary's decision to invoke the bypass did not violate the first amendment's establishment clause. Consequently, defendants argue that, as a result of the court's decision in *Wamble,* principles of *res judicata* prohibit plaintiffs from challenging the operation of the bypass in this lawsuit.

Under the doctrine of *res judicata* "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The purpose of the doctrine is to ensure the finality of decisions and to prevent "litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). *Accord Montana v. United States,* 440 U.S. at 153, 99 S.Ct. at 970 (*res judicata* "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions").

Thus, two questions must be answered before this court can determine whether *res judicata* should bar plaintiffs' bypass-related claims: whether the issues involved in this lawsuit are the same as those raised in *Wamble* and whether the parties to the two cases are identical. The Eighth Circuit has adopted the test stated in the Restatement (Second) of Judgments to determine

whether two separately asserted claims arise from the same cause of action for *res judicata purposes:*

when a valid and final judgment rendered in an action extinguishes the

plaintiffs' claim pursuant to the rules of merger or bar ... the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

*Murphy v. Jones,* 877 F.2d 682, 684 (8th Cir.1989) (quoting *Poe v. John Deere Co.,* 695 F.2d 1103, 1106 (8th Cir.1982)) (quoting Restatement (Second) of Judgments § 24(1) (1982)) (ellipsis in original). In other words, in determining whether two causes of action are identical for *res judicata* purposes, this court must examine "whether ... the primary right and duty, and the delict or wrong are the same in each action." *Robbins v. District Court of Worth County, Iowa,* 592 F.2d 1015, 1017 (8th Cir.), *cert. denied,* 444 U.S. 852, 100 S.Ct. 107, 62 L.Ed.2d 69 (1979). In the instant case the issue sought to be litigated by plaintiffs, whether the operation of the bypass in Missouri is necessary or, in the alternative, whether it passes constitutional muster, was litigated and decided by this court in *Wamble.* Therefore, the first element of the *res judicata* test is clearly met.

The question of whether the parties to this suit are identical to those in *Wamble* is a bit more difficult to determine. Clearly, plaintiff Hugh Wamble was a party to this court's decision in *Wamble* and is a plaintiff in the instant action. In addition to Wamble, the remaining plaintiffs in this lawsuit are Reverend Rudy Pulido and Reverend John M. Swomley.[6] Defendants concede that neither Pulido nor Swomley were parties to the court's decision in *Wamble.* They argue, however, that both men are active in Americans United for Separation of Church and State (Americans United), which is not a party to this action but for which all parties concede plaintiffs' attorney is counsel. They note also that both men have actively participated in other litigation brought by Americans United.

From this information defendants conclude that the two men are so closely aligned with the plaintiffs in *Wamble* that the doctrine of *res judicata* should apply in this case.

Parties are identical for *res judicata* purposes if they "have a close relationship, bordering on near identity...." *Robbins,* 592 F.2d at 1017. Similarly, a person is in privity with a party to a prior action if "the interests of the non-party are so closely related to the interests of the party, that the non-party can fairly be considered to have had his day in court." *Gribben v. Lucky Star Ranch Corp.,* 623 F.Supp. 952, 960 (W.D.Mo.1985). Thus, in *Micklus v. Greer,* 705 F.2d 314, 317 (8th Cir.1983), the court held that a party who was not a defendant to two previous lawsuits was "sufficiently identified with the previous defendants for the doctrine of *res judicata* to apply."

The court believes a similar "sufficient identity" exists in the present case. Although Pulido and Swomley were not parties to the *Wamble* lawsuit, it is clear that if they had been parties plaintiff in Wamble, their interests in that lawsuit would have been identical to those of Reverend Wamble. Even if, however, the court found that principles of *res judicata* did not apply in this case, because the parties to the two lawsuits were not identical, the court would reach the same result on the bypass question as was reached in *Wamble.* Plaintiffs have pointed to no changes in the bypass procedure since the Supreme Court's decision in *Felton* that would in any way alter the analysis in which this court engaged in *Wamble.* Consequently, insofar as plaintiffs' claims relate to either the constitutionality or existence of the bypass procedure, those claims are barred.

### III. *Off The Top Allocation*

In their complaint plaintiffs challenge the Department of Education's decision to take both the costs involved in administering the bypass and the costs in-

---

6. At trial, plaintiffs' counsel orally stated that all plaintiffs other than these three individuals agreed to be dismissed. On November 30, 1989 plaintiffs filed a stipulation of dismissal to this effect and on December 1, 1989 the court entered its order dismissing all plaintiffs except the three listed above.

volved as a result of the Supreme Court's decision in *Felton* "off the top" of Missouri's Title I fund allocation. Plaintiffs argue that by taking these monies off the top the government is violating both the establishment clause, by providing more aid to the parochial school students than to the public school students, and the provisions of 20 U.S.C. § 2727(a) and (b), calling for equality of expenditures between public and parochial school students.

Section 2727(a) relates specifically to *Felton* costs and provides that

[e]xpenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools *shall be equal* (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency.

20 U.S.C. § 2727(a) (emphasis added). The statute defines the educational services and arrangements that must be included in the computation of the equal expenditures as services "such as dual enrollment, educational radio and television, computer equipment and materials, other technology and mobile educational services and equipment." [7] *Id.*

While section 2727(a) mandates equal expenditures for *Felton* costs, 20 U.S.C. § 2727(b) contains language pertaining to bypass costs. Section 2727(b) provides that bypass costs should be taken off the top of a state's Title I allocation and specifically directs that when the Secretary invokes the bypass provisions of Title I he or she "shall ... pay to the provider [of these services] the costs of such services, including the administrative costs of arranging for such services, from the appropriate allocation or allocations under this division." 20 U.S.C. § 2727(b)(3)(B). Section 2727(b)(3)(C) provides further definition, noting that the amounts to be withheld should be taken "from the allocation of the effected State or local educational agency...." Thus, the

language of the statute appears to support defendants' contention that, at a minimum, under the statute the bypass costs involved in administering Title I should be taken off the top of a state's allocation.

In addition to these statutory provisions, the Department of Education recently promulgated regulations relating to the allocation of *Felton* costs to the following effect:

[b]efore determining equal expenditures under paragraph (a)(1) of this section, an LEA shall pay for reasonable and necessary administrative costs of providing services to public and private school children, *including special capital expenses* defined in § 200.57(a)(2), from the LEA's whole allocation of funds under this part.

34 C.F.R. § 200.52 (contained in 54 Fed. Reg. 21771, May 19, 1989) (regulations went into effect forty-five days after date of publication). Section 200.57(a)(2) defines "capital expenses" as "expenditures for noninstructional goods and services that are incurred as a result of implementation of alternative delivery systems to comply with the requirements of *Aguilar v. Felton.*" In other words, under the new regulations the Department of Education requires that the instructional costs incurred as a result of *Felton* must be taken off the top of the state's Title I funding allocation. Plaintiffs argue that the regulation improperly changes the import of section 2727(a), which requires equal expenditures for public and private school children, while defendants argue that the regulation provides a method by which the private school children can obtain comparable services, taking into account the realities of the Supreme Court's decision in *Felton.*

At trial the parties presented a number of charts summarizing the per pupil costs of providing services in both public and private schools. Some of these charts account for the bypass costs alone and others combine bypass and *Felton* costs. Although the parties used differing methods

---

**7.** These services are the type that would be included as *Felton* costs, although the statute

does not mention *Felton* specifically.

to obtain these figures,[8] the charts provided by both parties show that the cost of providing services to parochial school students is greater than that of providing services to public school students because of both the administrative costs incurred in the bypass and because of the *Felton* costs.

In comparing the costs of providing services to public and nonpublic school students, plaintiffs relied on the budget figures for the 1988–89 program year. The chart below represents a sample of the comparison between expenditures per public school student and expenditures per nonpublic school student,[9] taking into account both bypass and *Felton* costs:

| School District | Expenditure Per Public School Student | Expenditure Per Nonpublic School Student |
|---|---|---|
| Community R–VI | 221.70 | 1520.60 |
| Cape Girardeau | 748.63 | 1577.76 |
| Union R–XI | 504.15 | 1529.78 |
| Kansas City 33 | 1212.93 | 2071.88 |
| DeSoto 73 | 679.44 | 2093.30 |
| Chillicothe R–II | 627.15 | 1519.71 |
| Portageville | 381.15 | 1365.73 |
| St. Genevieve R–II | 424.27 | 1136.95 |
| St. Louis City | 863.38 | 1448.32 |
| TOTAL ALL SCHOOL DISTRICTS | 837.54 | 1508.20 |

*See* Plaintiffs' Exhibit 209.

In addition, plaintiffs provided the court with a chart, identified as plaintiffs' exhibit 210, that shows the difference in per pupil expenditures in LEAs that are not subject to the bypass. This chart also includes *Felton* expenses. As the samples cited below illustrate, there is less of a difference in per pupil expenditure in those school districts that are not subject to a bypass than in those school districts with a bypass, although a difference does still exist:

**8.** As the discussion, *infra* at n. 9, notes, the parties do not agree on the proper method to use in calculating these figures. As a result, the figures provided by plaintiffs and those provided by defendants differ.

**9.** At trial the court and attorneys for all parties engaged in a protracted dialogue relating to the method by which plaintiffs obtained these figures. Defendants objected to plaintiffs' methodology on a number of grounds, including the fact that plaintiffs' numbers were based on budgeted, rather than actual, figures. *See* June 26, 1989 Transcript of Proceedings, Volume I, Pages 51–59 and Pages 66–69. In addition, defendants contended that plaintiffs' figures were inaccurate insofar as the budgeted figures used by plaintiffs for nonpublic school students contained only federal funds but the figure for the number of public school students included students who would not have been served but for the fact that state funds were given to the school districts. Defendants argue that plaintiffs' figures would be more accurate if either the budgeted figure for nonpublic school students included state funds or if the column reflecting the number of public school students did not include students who would not have been served but for state funds. While the court understands the point made by defendants, it does not believe that plaintiffs' failure to strictly parallel funds and students requires the court to ignore plaintiffs' exhibit 209. As the court noted at trial, Title I was designed to supplement state services and the Department of Education cannot rely on the existence of state funds to equalize differences in expenditures per public school and private school student. Nevertheless, the court notes that the differences in per pupil expenditures reflected by plaintiffs' exhibit 209 may be somewhat more marked than the actual differences.

| School District | Expenditure per Public School Student | Expenditure per Nonpublic School Student |
|---|---|---|
| Kirksville | 479.65 | 566.71 |
| Monett | 1355.86 | 458.14 |
| Cooper C–IV | 162.64 | 1203.50 |
| Lockwood | 423.48 | 550.80 |
| Independence | 643.10 | 886.64 |
| Pierce City R–VI | 400.08 | 2859.00 |
| Chaffee R–II | 501.09 | 743.57 |

*See* Plaintiffs' Exhibit 210.[10]

Defendants based their comparisons of per pupil costs on the 1987–88 school year, rather than the 1988–89 school year. Defendants arrived at the per pupil cost of serving public school children by dividing the total Chapter I expenditure for Missouri by the unduplicated number of children served by Title I and by state compensatory education programs.[11] This figure resulted in a cost of $837 per public school pupil. When the same procedure was used for determining the cost of providing Title I services to private school children, the defendants calculated that the cost, not including *Felton* expenses, of providing services to private school children was $1,000 per pupil while the cost when including *Felton* expenses was $1,248 per pupil. *See* Defendants' Exhibit 17.

In addition to the above figures, defendants also calculated what the cost per pupil would be if *Felton* costs were charged only to private school students and not taken off the top of a state's allocation. *See* Defendants' Exhibit 18. According to defendants' calculations, the off the top method results in a cost per pupil of only $22 if *Felton* costs are borne by both public and private school students, while the per pupil cost rises to $248 if the *Felton* costs are borne only by private school children. From these comparisons defendants con-clude that the monetary effect of taking *Felton* costs off the top of a state's allocation is minimal when compared on a per student basis. On the other hand, the per pupil *Felton* costs are substantial if only the private school students are charged. Defendants argue that the $226 per pupil difference in cost if *Felton* expenses are not taken off the top violates the Title I mandate that comparable services be provided to public and private school children and that, consequently, the DOE regulations requiring that *Felton* costs be taken off the top should be upheld.

Defendants rely heavily on the legislative history behind Title I to support their argument that both bypass and *Felton* costs should be taken off the top of a state's total Title I allocation. Indeed, Congress has always believed that non-public school students should receive Title I services. When Congress enacted the Elementary and Secondary Education Act of 1965, the Senate Labor and Public Welfare Committee specifically noted that although the act did not authorize funds for non-public school teachers or for the purchase of materials or equipment for such schools, "consistent with the number of educationally deprived children in the school district who are enrolled in nonpublic elementary and secondary schools, the local educational agency *will* make provision, under the terms of the Act, for including special edu-

---

**10.** Plaintiffs' Exhibit 210 does not include totals for all school districts as does Exhibit 209. Although the court considered adding the figures itself to arrive at an average total expenditure, it chose not to do so since figures were missing for some districts on Exhibit 210, and others reflected only summer school programs. As a result, the court feared that a direct comparison of totals might be misleading.

**11.** It is interesting to note that this method contains the same "fault" that defendants argued rendered plaintiffs' figures inaccurate, insofar as the denominator represents the number of students served by both federal and state monies while the numerator, the total expenditures, contains only federal expenditures.

cational services and arrangements." S.Rep. No. 146, 89th Congress, 1st Sess., *Reprinted in* 1965 U.S.Code Cong. & Admin.News 1446, 1456 (emphasis added).

Congress reauthorized Title I in 1978. As part of the reauthorization, the House Education and Labor Committee noted that "Title I funds have always been intended to reach eligible pupils in nonpublic as well as public schools." H.R.Rep. No. 1137, 95th Cong., 2nd Sess., *Reprinted in* 1978 U.S. Code Cong. & Admin.News 4971, 5002. In addition, the House report stated that while the law "basically repeats the language of present law regarding the participation of private school children ..., a new provision is included requiring equal expenditures on Title I children in private schools...." *Id.* at 5003. According to the House committee "[t]he addition of this equal expenditure requirement is intended by the Committee to insure that children enrolled in private elementary and secondary schools will receive comparable benefits from programs authorized by Title I ...." *Id.*

Congress reiterated its concern that Title I expenditures for non-public school children be equal to expenditures for public school children during its discussion of Title I as part of the Omnibus Budget Reconciliation Act of 1981. At that time, Congress specifically noted that in situations where the Secretary authorizes a bypass of the state or local educational authority "the State's payment is to be reduced in the amount necessary to pay the costs of the private school services." S.Rep. No. 139, 97th Cong., 1st Sess., *Reprinted in* U.S. Code & Admin.News 396, 927. Thus, since at least 1981 it has been the clear intent of Congress that the cost of the bypass be taken off the top of a state's Title I allocation.

In 1987 the House began consideration of the School Improvement Act of 1987. The bill under consideration, H.R. 5, provided that "[e]xpenditures for educational services and arrangements ... for educationally deprived children in private schools shall be equal ... to expenditures to children enrolled in the public schools of the local educational agency." H.R. 5, Section 1017.

In addition, the bill provided an authorization of thirty million dollars "for fiscal year 1988, and such sums as may be necessary for each of the fiscal years 1989, 1990, 1991, 1992, and 1993" to "be used for increases in capital expenses paid from funds under Chapter I of the Education Consolidation and Improvement Act." *Id.* Congress anticipated that these funds would be used to pay local educational agencies for the provision of services to private school children "when without such funds, services to private school children would have been or have been reduced or would be reduced or adversely affected." *Id.* The bill defined "capital expenses" as "limited to expenditures for noninstructional goods and services such as the purchase, lease and renovation of real and personal property (including but not limited to mobile educational units and computer equipment and materials), insurance and maintenance costs, transportation, and other comparable goods and services." *Id.*

During congressional debate on the provisions of H.R. 5 several comments were made in regard to the section of the bill providing for a thirty million dollar allocation to private schools for capital expenses. Congressman Augustus F. Hawkins of California summarized the bill for members of Congress and specifically noted that one purpose of the bill was to help "private schools that were adversely affected by the 1985 Supreme Court *Felton* decision, to better cope with the additional costs of services for Chapter I private school children." 133 Cong.Rec. H 3767 (Daily Ed. May 20, 1987) (statement of Congressman Hawkins). In addition, Congressman William D. Ford of Michigan stated that

H.R. 5 continues the historic requirement that private school children residing in eligible school districts receive chapter 1 services on an equitable basis with children in public elementary and secondary schools.

In 1985, the Supreme Court ruled in Aguilar versus Felton that publicly paid teachers could not provide compensatory education services on private school premises, particularly religious schools. As a result of that court ruling, there

was an estimated 35–percent drop in the number of private school children receiving compensatory education services in the year following the decision.

H.R. 5 authorizes $30 million in fiscal year 1988, and such sums thereafter as may be necessary for a program to help school districts purchase capital equipment—such as mobile units—to provide chapter I compensatory education to eligible private schools in a manner compatible with the court's 1985 ruling.

*Id.* at H3769 (comments of Representative Ford).[12] One year later Congressman Ford again bluntly stated that one of the primary purposes of H.R. 5 was "to provide for an authorization of funds to cover the costs of 'capital expenses' incurred by local school officials in attempting to continue to provide equitable services" to public and private school students as a result of the *Felton* decision. 134 Cong.Rec. H1815 (Daily Ed. April 19, 1988) (statement of Congressman Ford).

As noted above, debate on H.R. 5 and its Senate counterpart, S.R. 373, continued into 1988. The Senate Labor and Human Resources Committee noted that as a result of the Supreme Court's decision in *Felton,*

> schools have had to implement costly, disruptive, and creative procedures to serve private school children.
>
> The Committee strongly believes that these eligible children should be served. Service to eligible private school children has been a provision in law since its enactment in 1965....
>
> The Committee has therefore added an additional authorization of $50 million in fiscal year 1989 and 'such sums as may be necessary' through 1993 to assist school districts in complying with the Supreme Court decision. This new authorization is in the form of 'capital ex-

penses' and is to be used solely for the additional cost of delivering services to private school children through alternative means....

S.Rep. No. 222, 100th Cong., 2nd Sess., *Reprinted in* U.S.Code & Admin.News 101, 114.

On April 27, 1988 President Reagan signed the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 into law. *See* Public Law 100–297. The legislation enacted by Congress carefully tracks the language of H.R. 5 and includes a $30 million authorization for fiscal year 1988, a $40 million authorization for fiscal year 1989, "and such sums as may be necessary for each of the fiscal years 1990, 1991, 1992, and 1993." Public Law 100–297, Section 1017(d)(2)(B)(3).[13] This authorization is to pay for capital expenses "when, without such funds, services to private school children would have been or have been reduced or would be reduced or adversely affected." *Id.*

■ This brief review of the legislative history of P.L. 100–297, combined with the Secretary's regulations promulgated on May 19, 1989[14] illustrate that the clear intent of Congress after the Supreme Court's decision in *Felton* was to provide more money to the local educational authorities in order to provide Title I services to private school students in the wake of *Felton.* Defendants argue that this history supports their position that both the costs of operating the bypass in Missouri and the costs incurred as a result of the Supreme Court's decision in *Felton* should be taken off the top of the state's allocation in order to provide equal services to both public and private school students. Plaintiffs, on the other hand, argue that by taking these expenditures off the top of the allocation the state and local educational

---

**12.** In addition to the above comments, Representative Ford noted that he amended H.R. 5 "to require a GAO study of the impact of the *Felton* decision on private schools, and whether the provision of capital expenditures will enable school districts to again serve the numbers of children they were serving prior to the *Felton* decision...." *Id.* The court has found no

record of whether such a study was ever performed.

**13.** Note this amount differs from the authorization suggested by the Senate. *See, supra,* at 584.

**14.** *See, supra,* at 580.

authorities are not able to serve as many public school students and, therefore, are at least implicitly violating the first amendment's establishment clause.

■ The starting point for any establishment clause analysis is the Supreme Court's three-part test first enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under this test a court faced with the question of whether financial aid to education constitutes an establishment of religion must consider (1) whether the statute has a secular legislative purpose, (2) whether the principle or primary effect of the statute neither advances nor inhibits religion and (3) whether the statute fosters an excessive entanglement by the government with religion. *Id.* at 612–13, 91 S.Ct. at 2111. In the instant case, as is often true in education-related challenges to the establishment clause, the parties agree that the statute has a secular legislative purpose and disagree only over the second two parts of the *Lemon* test.

In *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court held that state programs designed to provide materials and services to parochial schools violated the establishment clause. The court specifically noted, however, that "[w]e need not decide whether substantial state expenditures to enrich the curricula of church-related elementary and secondary schools, like the expenditure of state funds to support the basic educational program of those schools, necessarily result in the direct and substantial advancement of religious activity." *Id.* at 369, 95 S.Ct. at 1765. The question presented to the court in the instant case is similar to that framed by the Supreme Court, but not answered, in *Meek:* whether substantial state expenditures of public dollars to support remedial education services

for parochial school students violate the first amendment's establishment clause.

In determining whether the requirement that bypass and *Felton* costs be taken off the top of a state's Title I allocation has the primary effect of establishing religion, this court must determine whether the aid "flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or [whether] it funds a specifically religious activity in an otherwise substantially secular setting." *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). In other words, if the government aid "has the effect of promoting a single religion or religion generally and ... the aid unduly entangles the government in matters religious," the program providing the aid is unconstitutional even though "[p]roviding for the education of school children is surely a praiseworthy purpose." *School District of the City of Grand Rapids v. Ball*, 473 U.S. 373, 382, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267 (1985).

In the instant case the question before the court is a narrow one: whether the disparity in amounts spent per public and private school pupil as a result of bypass and *Felton* costs amounts to an unconstitutional establishment of religion. Although the Supreme Court apparently has never directly addressed this precise issue a number of lower courts have considered it.[15] Each of those courts has found that the test to be used is whether the cost of providing services to the private school students is "so grossly disproportionate" to the costs of providing services to the public school students that the services "provided to the nonpublic youngster [are] a mere ruse to confer a 'direct' benefit on the church affiliated school in allowing it to operate at all." *Cromwell Property Owners Assoc. v. Toffolon*, 495 F.Supp. 915, 923 (D.Conn.1979).[16] *Accord Member of*

---

15. In *Wolman v. Walter*, 433 U.S. 229, 234, 97 S.Ct. 2593, 2598, 53 L.Ed.2d 714 (1977), the Supreme Court noted that the program at issue, which was found to be constitutional, required that the amount of money expended per private school student could not exceed the amount of money expended per public school student.

16. In *Cromwell Property* the court held that the state's decision to provide private school students with transportation did not confer a direct benefit on the private schools.

*Jamestown School Committee v. Schmidt,* 699 F.2d 1, 10 (1st Cir.), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983) (cost of providing bus transportation to private school students was not "more expensive than intra-district busing of regular public students" and did not, in all likelihood, violate the Constitution); *Bollenbach v. Board of Education of Monroe–Woodberry Central School District,* 659 F.Supp. 1450, 1461 (S.D.N.Y.1987) (court notes "grossly disproportionate" test of *Schmidt* ); *Bennett v. Kline,* 486 F.Supp. 36, 39 (E.D.Pa.), *aff'd,* 633 F.2d 209 (3d Cir.1980) (program providing transportation costs to private school students was not so grossly disproportionate as to be a mere ruse to confer a benefit on parochial school students).

In the instant case all parties have cited various rules of statutory construction in support of their arguments as to why the costs of providing services to parochial school students either do or do not violate the first amendment. The question presented to the court, however, is not how to interpret the statute; the meaning of the statute is quite clear given both its wording and its legislative history. Rather, the question before the court is whether the statute provides grossly disproportionate funds to parochial school students so as to appear to be conferring a benefit on the religiously affiliated schools.

In the case of the bypass related costs the court finds that the off the top method of allocation is permissible. The net effect of the public school students absorbing the costs of the bypass is *de minimus.* In addition, those costs are necessary to effectuate one of the underlying purposes of Title I: to provide remedial services to students in both public and private schools. This purpose is clearly constitutional. *See, e.g., Wolman v. Walter,* 433 U.S. 229, 248, 97 S.Ct. 2593, 2605, 53 L.Ed.2d 714 (1977) (providing remedial services to private school students does "not have the the impermissible effect of advancing religion").

The court is more troubled, however, by the Secretary's regulations providing that *Felton* costs come "off the top" of a state's Title I allocation. As noted earlier, the figures provided by the parties differ as to the amount of disparity between the per pupil cost of public and private school students as a result of *Felton.* Defendants argue that it is only $248 per student while, according to plaintiffs' figures, the amount spent per pupil as a result of *Felton* can be almost four times greater per private school student than per public school student.

Taken alone, the difference in these costs might not cause the court much concern. When, however, this difference is combined with the congressional decision to appropriate $30 million in fiscal year 1988, $40 million in fiscal year 1989 and such other amounts as may be necessary through fiscal year 1993, the court is more alarmed. While this grant of aid by Congress goes to the local educational authority to cover the costs of compliance with *Felton,* the direct effect of the aid is specifically "to provide Chapter I services to educationally deprived children enrolled *in private and parochial schools.*" 134 Cong.Rec. H. 1816 (comments of Rep. Ford) (quoting a summary of H.R. 5 appearing in the April 9, 1988 Congressional Quarterly) (emphasis added). This comment, combined with the legislative history previously discussed,[17] clearly illustrates to the court that Congress' purpose in reauthorizing the Title I program, and the Secretary's purpose in promulgating the May 19, 1989 regulations, was directly to aid parochial schools in providing remedial educational services in compliance with *Felton.* Thus, although the money flows to the local educational agencies and not to the schools directly, the only purpose for its use is to increase the number of parochial school children receiving Title I services. This type of aid is not the type of "indirect and incidental" benefit that the Supreme Court has recognized as constitutional. *See Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 775, 93 S.Ct. 2955,

17. *See, supra,* at 582–584.

2966–67, 37 L.Ed.2d 948 (1973). Rather, this aid confers the type of direct benefit to the private schools that the Supreme Court has found to be impermissible because it provides "a subsidy to the primary religious mission of the institutions affected." *Ball*, 473 U.S. at 385, 105 S.Ct. at 3223.[18]

The court recognizes that, undoubtedly, many who read this decision will comment that the court has lost sight of the purpose of Title I: to provide remedial educational services to students who need them, regardless of the nature of the school which those students attend. The court emphasizes, however, that it cannot constitutionally sanction a program that has as its primary purpose, as evidenced by both Congress and the agency charged with administering it, the goal of providing services specifically to parochial school students as a result of a Supreme Court decision which cut back the number of such children that had previously been served.

Indeed, the court notes that the type of aid authorized by the off the top allocation, coupled with the funding authorized by P.L. 100–297, does not vary significantly from the situation of which Justice Powell warned in his concurring opinion in *Felton*. In that opinion Justice Powell foresaw that aid which amounted "to a state subsidy of the parochial schools by relieving those schools of the duty to provide the remedial and supplemental education their children require" would violate the Constitution. *Felton*, 473 U.S. at 417, 105 S.Ct. at 3240 (Powell, J., concurring). This court believes that the net effect of allocating money for capital expenses directly to private school students is essentially the same as the situation of which Justice Powell warned. While it is constitutional to use public funds to provide for the remedial education of public school students the Constitution does not require, and indeed this court finds that it forbids, the taking of federal funds from public school students in order to allow the services to be provided to private school students. Therefore, judgment shall be entered in favor of plaintiffs on their claim that the off the top allocation of *Felton* costs violates the establishment clause of the first amendment since that method of allocation directly benefits the private school students at the expense of those students in public schools.

### IV. *Location of Mobile and Portable Units*

██ Plaintiffs also argue that the current method of providing Title I services to private school students is unconstitutional insofar as those services are being provided through the use of either portable units located on the parochial school property or the use of mobile units temporarily parked on public property directly outside of the parochial schools.[19] Evidence adduced at trial established that in the majority of instances where mobile units are used, they are parked on public streets as close as is possible to the private schools. In some instances, however, where Blue Hills Home Corporation (BHHC)[20] has "been unsuccessful in locating space on public property to park the van and where, because of city ordinance and other things, no space is available, etc., that [sic] we have had as a last resort to place the unit on school property...." Testimony of Delorise Gines, Associate Director of the Blue Hills Home Corporation, June 27, 1989 Transcript of Proceedings at 31.

In those situations where BHHC decides to place the mobile units on school property

---

**18.** In *Decker v. O'Donnell*, 661 F.2d 598 (7th Cir.1980), the United States Court of Appeals for the Seventh Circuit found that the payment of Comprehensive Employment Training Act (CETA) funds to sectarian schools was unconstitutional, in part because of the concern that sectarian schools could possibly receive "a substantial proportion" of all CETA funds, a result that might implicate first amendment concerns. *Id.* at 609. The court believes similar concerns are present in the instant case where Congress specifically authorized a large portion of money

to be used only for the benefit of private school students.

**19.** According to Delorise A. Gines, Associate Director of the Blue Hills Home Corporation, the "mobile units used are either commercial RVs [recreational vehicles] or busses" while "[t]he portable units used are trailers." Supplemental Declaration of Delorise A. Gines, May 31, 1989, submitted as Defendants' Exhibit 4.

**20.** BHHC administers the bypass in Missouri.

"it is [its] policy and practice ... [to] place that unit as far away from the [parochial school] building as is possible." *Id.* Ms. Gines emphasized that in deciding where to place the vans, BHHC is primarily concerned with finding a location which will provide the easiest and safest route for the children to get to the van. *See also* Supplemental Declaration of Delorise A. Gines, Defendants' Exhibit 4 at ¶ 2 (explaining that the location of the vans is determined in part by the fact that "the participating children must be 'able to walk or ride in buses or other vehicles to facilities along safe and healthful routes in a reasonable amount of time....' ").

Gines testified at trial, and plaintiffs apparently do not dispute, that the vans and mobile units are not in any way under the control of the non-public schools and that the administrators and teachers of those schools do not use the leased spaced for any purpose. Plaintiffs argue, however, that it does not matter whether the private school officials actually use the vans and mobile units since their location either on public property directly adjacent to the private schools or, in some instances, on private school property, creates the appearance of an association with the private school. It is this "symbolic union" between federal funds and the parochial schools that the plaintiffs complain is unconstitutional and violates the second prong of the *Lemon* test, prohibiting any action that either inhibits or advances religion. In addition, plaintiffs contend that the administrative contacts between the parochial school teachers and the BHHC officials violate the third prong of the *Lemon* test relating to excessive entanglement.

As was true in their challenge to the off-the-top allocation, plaintiffs concede that the first part of the *Lemon* test, that the statute has a secular legislative purpose, is met in this case. Plaintiffs argue, however, that the second part of the test, is not met in this case because the placement of the mobile units and vans in close proximity to the parochial schools gives the appearance of the state advancing the practice of religion. In arguing that the placement of the vans on public property near

the schools or, in limited situations, on the parochial school property itself, is constitutional, defendants rely heavily on the Supreme Court's decision in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). In that case the Supreme Court held "that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion." *Id.* at 248, 97 S.Ct. at 2605. In addition, both sides cite Justice O'Connor's dissenting opinion in *Felton*, noting that even after *Felton*, "[i]mpoverished children who attend parochial schools may also continue to benefit from Title I programs offered off the premises of their schools—possibly in portable classrooms just over the edge of school property." *Felton*, 473 U.S. at 430–31, 105 S.Ct. at 3247–48 (O'Connor, J., dissenting). Defendants contend that both of these statements establish that the Supreme Court has at least implicitly approved the use of portable units on the edge of school property, while plaintiffs argue that Justice O'Connor's language is merely dicta and suggests only a possibility, the constitutionality of which has not yet been decided by the Supreme Court.

The Supreme Court has long recognized that "[t]he First Amendment ... does not say that in every and all respects there shall be a separation of Church and State." *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). Indeed, the Court has recognized that the separation of church and state "cannot mean absence of all contact; the complexities of modern life inevitably produce some contact...." *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 676, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970). *See also Hunt*, 413 U.S. at 742–43, 93 S.Ct. at 2873–74 ("the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected"); *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112 ("Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense.").

Perhaps because of this recognition that total separation is not possible the Court has held that it "can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Mueller v. Allen,* 463 U.S. 388, 393, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)). As a result, the Court has reminded both lower courts and the American public that the *Lemon* test, while helpful in determining whether an establishment clause violation exists, is only a signpost. *Id.* 463 U.S. at 394, 103 S.Ct. at 3066. *See also Hunt,* 413 U.S. at 741, 93 S.Ct. at 2873. Thus, while this court may be guided by the Supreme Court's three-part test enunciated in *Lemon,* it is also mindful of the fact that any establishment clause analysis must rest, in large part, on the common sense view of whether the use of mobile units or vans appears symbolically to link church and state.

### A. Use of Mobile Units on Private School Premises

Although BHHC's preferred method of providing services to private school students is to "place" mobile vans on public property directly adjacent to the non-public schools, in several cases services are provided directly on such a school's property either in mobile units or, in limited circumstances, in portable units that are parked on or near the school grounds throughout the school year.[21] Plaintiffs claim that by providing services in this manner defendants violate the first amendment because individuals affiliated with the parochial school, or individuals driving past the school, will perceive the unit "merely as an annex of the school or schools it services." *Wolman,* 433 U.S. at 246, 97 S.Ct. at 2604.

Plaintiffs argue that even though BHHC may try and place the units as far from the actual school building as possible, the mere fact that the unit is located on a school parking lot or playground creates the unconstitutional appearance of the state endorsing religion. Defendants reject this argument, noting that units are placed on school property only when no public property is available near the school grounds. They add that if the units could not be placed on the private school's property, the students might not be able to receive Title I services.[22]

Even before the Supreme Court decided *Felton,* a federal court was faced with the task of deciding whether defendants violated the first amendment by leasing space in closed parochial school buildings to the public schools which needed additional classroom space. *Americans United For Separation of Church and State v. Porter,* 485 F.Supp. 432 (W.D.Mich.1980). One of the two parochial schools then resumed partial operations, so that the public school operated as an "annex" to the private school building and the parochial school students in that building floated between

---

**21.** Defendants' Exhibit 3 provides the location of all units as of May 1989. According to this exhibit, 17 schools are served by mobile units parked directly on school property. These vans are located anywhere from 25 feet from the school building itself (St. Frances Xavier in Kansas City) to 300 feet from the building (St. Peters in Jefferson City and St. Joachin in Kingston Cadet). The majority of the units are located 30–50 feet from the parochial school building. The two portable units are located in Oran, on a private lot approximately 125 feet from the school and in Portageville, on school property approximately 50 feet from the main building. With the exception of St. Joseph School in Francis Howell R–III District and St. Joseph School in Ste. Genevieve School District, where mobile units are located on private property away from school grounds, the rest of the units are located on public property directly outside of the school.

**22.** A substantial portion of the testimony at the supplemental trial related to the use of computer assisted instruction (CAI), wherein Title I students receive the majority of their instruction through the use of "take home" computers rather than directly from Title I teachers on site. Plaintiffs argue that the take home computer program could be expanded to provide services to parochial school students in situations where there is no constitutional means of providing services. Defendants argued at trial that the computer program is not the preferred method of teaching due to the lack of one on one contact between teacher and student. The court need not, and will not, decide how best to provide these services and notes plaintiffs' argument only for general interest and to show, in light of its decision in this case, that alternative methods of providing services do exist.

parochial school and annex classes. *Id.* at 434.

In finding that this arrangement resulted in an unconstitutional advancement of religion, the court noted that the parochial school students could receive a complete high school education, including education in non-religious subjects, without ever leaving the parochial school campus and that "the Annex program has provided the greatest benefit which the state could bestow upon a sectarian school: the financial ability to continue its educative religious functions without bearing all of the otherwise prohibitive costs of doing so." *Id.* at 437. The court concluded that a sign identifying the Annex as a public school did "not prevent the premises from being 'physically [or] educationally identified with the functions of the non-public school,' particularly where, as here, there is no difference in student population between the public school and parochial school sections of the building." *Id.* at 438 (citation not included).

Although the situation in the present case is not as marked as that presented in *Americans United,* since the parochial school students here receive only Title I services and not all nonreligious education in the mobile units, similar concerns exist. In both situations students are simply traveling to another section of school property, part of a "campus atmosphere," to receive a portion of their education. The court finds it difficult to believe that either the students or those passing the private school property would disassociate the mobile units from the private schools, even if Title I signs identified the vans.

In the years since the Supreme Court's decision in *Felton,* courts have expressed similar concerns over the question of how to provide Title I services to parochial school students in light of the fact that those services can no longer be provided inside the parochial school buildings. In *Parents' Association of Public School 16 v. Quinones,* 803 F.2d 1235 (2d Cir.1986), a parents of public school students challenged the school district's decision to provide Title I services to a group of students of the Satmar Hasidic Jewish Sect in a separate section of the public school. Because "the Hasidic faith stresses a strict separation between the Hasidim and the rest of society," the local school district decided to dedicate a group of nine classrooms in the northwest section of the public school to students from the Jewish school. *Id.* at 1237. Under this arrangement the private school students, all girls,[23] would be taught in this separate wing by female public school teachers who spoke both Yiddish and English and could teach English as a second language.[24] *Id.* The parents of the public school students [25] challenged this arrangement on establishment clause grounds, arguing that it had the primary effect of promoting religion and that it excessively entangled the state in religious matters.

The district court denied plaintiffs' request for a preliminary injunction, finding that the public school's method of providing services to the students was permissible based on the Supreme Court's language in *Wolman* that the "provision of remedial services 'at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion....'" *Id.* at 1239 (quoting *Wolman,* 433 U.S. at 248, 97 S.Ct. at 2605). On appeal, the public school parents argued that the district court erred in this finding because the method of providing Title I services had the impermissible effect of promoting the Hasidic religion. The Second Circuit agreed with this argument, noting that "the City's Plan seems plainly to create a symbolic link between the state and the Hasidic Sect that is likely to have a magnified negative impact on the minds of the youngsters attending P.S. 16." *Id.* at

---

**23.** The Hasidic Sect requires "the separation of males and females for virtually every activity, including schooling." *Id.* at 1237.

**24.** English is a second language for most of these students.

**25.** The majority of students at Public School 16 are Hispanic.

1241. Thus, the court of appeals rejected the district court's finding that "[t]he placement of students at P.S. 16 is an accommodation and not a symbolic union between church and state...." *Id.* at 1239 (quoting Memorandum Decision and Order of District Court, September 15, 1986 at 8). *See also Bollenbach v. Board of Education of Monroe–Woodbury Central School District,* 659 F.Supp. 1450 (S.D.N.Y.1987) (district court finds that school district's decision to allow male Hasidic students to veto the assignment of female bus drivers, because their religion prohibited interaction between the sexes, violated the first amendment's establishment clause because, *inter alia,* the action created a symbolic union between church and state).

While the situation presented here by the use of mobile units parked on private school premises may not be as pronounced as those found unconstitutional by the courts in *Americans United, Quinones,* and *Bollenbach,* this court believes that the instant case does present an unconstitutional advancement of religion on the part of the state. In *Wamble* this court noted that "[i]nstruction conducted *on the premises* of pervasively sectarian institutions ..., while providing a practical response to the growing economic needs of parochial schools and the state, creates in Missouri an unacceptable *risk* that teachers here will foster religion...." *Wamble,* 598 F.Supp. at 1371 (emphasis in original).[26] Although BHHC has moved the location of the Title I services from inside the parochial schools to mobile units located away from the school building, but still on school grounds, the fact remains that the services are still being provided "on the premises" of the private schools and, therefore, the same risks noted in *Wamble* continue to exist.[27]

While the risk of people perceiving a link between the private schools and the mobile units may be less than when services were provided inside the parochial schools themselves,[28] students receiving Title I services are still receiving those services on private school grounds. This court finds it difficult to believe that an elementary school student who merely leaves the main building and walks a few yards to a mobile unit where he receives instruction perceives any difference between his Title I classes and classes he attends inside of the main building. Similarly, a passerby noting the presence of a mobile unit on the parochial school grounds will undoubtedly identify the unit with that school. This result is especially true since parochial schools, in many instances, are located on "campuses," which contain not only the parochial school building but also a church, a rectory and a convent. Thus, to both individuals associated with the private schools and those that merely pass the private schools, the mobile vans located on the school property will most likely be seen as some form of annex to the mission of the church. This identification creates an impermissible link between the church and the state. Consequently, this court finds that the provision of Title I services to parochial school students on private school property violates the first amendment's establishment clause.

### B. *Use of Mobile Units on Public Property Directly Adjacent to the Private Schools*

The provision of Title I services in mobile vans located on public property directly adjacent to the private schools presents similar concerns. In the majority of these cases, the vans are located on public

---

**26.** The court also noted that "[s]upervision of public employees performing public functions *on public property* does not create any entanglement between church and state." *Id.* (quoting *Wolman,* 433 U.S. at 248, 97 S.Ct. at 2605) (emphasis in original).

**27.** As noted, *supra,* at 588, the Supreme Court in *Wolman* specified that providing services "off the premises" of the parochial school was constitutional. The Court did not opine as to the

constitutionality of providing services on a separate building on the premises.

**28.** Indeed, this proposition is subject to debate since when Title I services were provided inside the private schools passersby presumably did not know that state funds were being used to provide instruction inside the schools. These same individuals can now "see" the symbolic union, however, due to the presence of the vans on the private school property.

streets adjacent to the private schools. In many cases, mobile units located on the private school property are actually closer to the parochial school building than are the vans located on a public street adjacent to the private school.[29] Thus, plaintiffs argue that the fact that the vans are located on public property is immaterial and the same concerns regarding a symbolic link between church and state exist when the van is located on public property as when the vans are located on school grounds.

Defendants, on the other hand, argue that the Supreme Court has implicitly, if not explicitly, approved the use of mobile units on public property outside of the parochial schools. In support of this argument defendants again rely on the Supreme Court's language in *Wolman* that remedial services may be provided "at a neutral site off the premises of the nonpublic schools...." *Wolman*, 433 U.S. at 248, 97 S.Ct. 2593. They also cite Justice O'Connor's dissenting opinion in *Felton*, suggesting that "portable classrooms just over the edge of school property" may be used to provide parochial school students with Title I services. *Felton*, 473 U.S. at 430–31, 105 S.Ct. at 3247–48 (O'Connor, J., dissenting).

The court agrees with plaintiffs' contention that Justice O'Connor's comments in *Felton* reflect merely a suggestion of one possible method of providing Title I services to parochial school students in the wake of *Felton*. The court finds, however, that the operative concern in determining whether the placement of mobile units on public school grounds directly outside of the private schools violates the Constitution is whether this location is a "neutral" site. In other words, this court must determine whether mobile units located directly outside of a parochial school evidence a truly neutral location or whether their location so close to the church-affiliated schools is such that they will be considered an annex of the schools and, therefore, of the church. This inquiry is made even more

difficult by the fact that, in many instances, the vans located on public property are actually physically closer to the private schools than are many of the mobile units located directly on the private property.

The court recognizes that this determination requires the drawing of lines so fine that many reading this opinion will conclude that the lines need not exist at all. The fact remains, however, that constitutional analysis in general, and first amendment analysis in particular, often requires courts to engage in such line drawing. The court concludes in this instance that it will be applying a clearly determinable standard if it adheres to the public-private distinction. Otherwise, the court would find itself engaged in the vexing question of how far from parochial school property must the separate unit be in each case. In the instant case, therefore, this court concludes that the provision of Title I services to parochial school students in portable units or vans located on public property outside of the parochial school does not violate the dictates of the establishment clause.

In reaching this decision the court admits that it has given great consideration, and deference, to the purpose of Title I: to provide "[e]ducational assistance to children who through no fault of their own have been deprived in their early lives and whose futures may be bleak without the kind of remedial education envisioned by this statute...." *Wamble*, 598 F.Supp. at 1373–74. The court concludes that a contrary holding would render the purpose of Title I virtually impossible. The Supreme Court has repeatedly held that Title I services may constitutionally be provided to parochial school students. These services must be provided somewhere and this court finds that providing those services off the premises of the private school serves as enough of a separation to satisfy the first amendment. In addition, this arrangement best serves the interests of the children,

---

**29.** For example, at St. Vincent School in Perry County # 32 District the van is on a public street 20 feet from the school while at First Assembly Christian School in Hannibal and St. John Tri School in Kansas City the vans are on public streets 25 feet from the schools. Similarly, at Bishop Hogan in Chillicothe, and at St. Brendan School in Mexico, the vans are 35 feet from the schools. *See* Plaintiffs' Exhibit 16.

interests which may not be totally ignored in first amendment analysis.[30]

In their briefs plaintiffs also challenge the current provision of Title I services to private school students under the third part of the *Lemon* test involving excessive entanglement. In order to determine whether government entanglement with religion is excessive the court "must examine the character and purposes of the institutions that are benefited, the nature of the aid that the state provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112. In the instant case, plaintiffs argue that the contacts required between the individuals administering the Title I program and the parochial school teachers excessively entangle the government with religion. Throughout both the trial and their brief plaintiffs argued that excessive entanglement exists in this case due to the fact that BHHC administrators and private school teachers must confer on areas such as class scheduling and student discipline. In *Lemon*, however, the Supreme Court recognized that "some involvement and entanglement [is] inevitable...." *Id.* at 625, 91 S.Ct. at 2117.

■ One problem with analyzing entanglement issues is that in order to assure that no first amendment violation occurs in programs such as Title I, the government must necessarily perform some form of monitoring function, often requiring contact with the religious officials. *See Kendrick*, 487 U.S. at ——, 108 S.Ct. at 2578. This type of monitoring activity does not violate the establishment clause, however. In the instant case the Title I program could not exist if the teachers who have primary authority over the parochial school students were not allowed to confer with

the BHHC officials over issues such as scheduling of Title I services and discipline problems. Each of these individuals is involved in the same primary goal: helping to educate these children. There is no evidence before this court that either the parochial school teachers or the BHHC administrators skirt this purpose to engage in discussions or activities that would violate the first amendment. Indeed, Delorise Gines testified at trial that the teachers employed by BHHC to provide Title I services to the parochial school students are specifically instructed to avoid any religious discussions. *See* June 27, 1989 Trial Transcript, Volume II at 25 (testimony of Delorise Gines). Therefore, any attempt by plaintiffs to invalidate the Title I program based on entanglement issues must be denied.

In conclusion, the court reiterates its acknowledgment that the lines drawn in this case are fine ones and that many reading this opinion might disagree with, not only their placement, but the fact that a federal court has the power to determine how educational services will be provided to children whose parents have chosen to provide them with parochial school educations. As the district court honestly noted in *Americans United*,

> it is particularly difficult for the court to explain to the defendants why such an otherwise worthwhile state of affairs cannot be allowed to continue and why a federal court should feel the need to intervene at all. The short and dispositive answer, of course, is that the program clearly violates the Establishment Clause of the First Amendment as it has been interpreted over the years by the United States Supreme Court. Beyond that, however, is the historical perspective in which the First Amendment was adopted and the role it has played in fostering a robust democratic society in which reli-

---

**30.** The court notes that it gave lengthy consideration to the possibility of requiring the vans to drive one or two blocks away from the school after picking up the children, in order to park on public property that would not be physically identified with the private schools. The mobile vans do not, however, have bathrooms on board. June 25, 1986 Gines Deposition Transcript at 112–13. Although the children are on the vans only for limited periods of time the court does not believe it would be wise to move the vans away from the school buildings in the event a child needed to use the restroom facilities.

**594**

gious freedom exists to enrich the lives of its citizens.

485 F.Supp. at 444.

This court agrees with the court in *Americans United* that it is difficult to explain to defendants why parts of the Title I program must be found unconstitutional. The court finds it especially awkward to explain the outcome to those children who will be affected by the court's decision. The court hopes that those children and their parents recognize that it is only because of the very freedoms guaranteed by the first amendment that they have the option of attending parochial schools. As paradoxical as it may seem, this court's decision is necessary to insure that those very freedoms continue.

Finally, the court notes that plaintiffs' complaint contains a prayer for attorneys' fees. Since plaintiffs have prevailed on some of the claims stated in their complaint, it appears as though an award of partial attorneys' fees may be appropriate. Therefore, the court will require the plaintiffs to submit a motion for attorneys' fees within thirty days of the date of this order. This motion should state the amount of fees sought as well as the basis for awarding the fees. It should be substantiated with affidavits detailing hours spent working on the case. Defendants will then have thirty days to respond to the motion. Accordingly, it is

ORDERED that judgment be entered in favor of plaintiffs on their claim that taking *Felton* costs off the top of a state's Title I allocation is unconstitutional. Defendants are hereby enjoined from continuing this practice. It is further

ORDERED that judgment be entered in favor of plaintiffs on their claim that the provision of Title I services in mobile units or vans located on parochial school property is unconstitutional. Defendants are hereby enjoined from continuing this practice. It is further

ORDERED that judgment be entered in favor of defendants on all remaining claims in plaintiffs' complaint. It is further

ORDERED that plaintiffs file a motion for attorneys' fees within thirty days of the date of this order. It is further

ORDERED that defendants respond to plaintiffs' motion within thirty days of its file-stamp date.