**COMMITTEE FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY, Florence Flast, Helen Henkin, Hazel Smith, Denise Krouser and Christina Walker, Plaintiffs,**

v.

**SECRETARY, UNITED STATES DEPARTMENT OF EDUCATION, Commissioner of Education of the State of New York, and Chancellor and Board of Education of the City of New York, Defendants,**

and

**Rachel Agostini, et al., Defendant–Intervenors,**

and

**Leah Saks, et al., Defendant–Intervenors.**

No. 88–CV–0096 (JG).

United States District Court, E.D. New York.

Oct. 17, 1996.

Stanley Geller, New York City, for Plaintiffs.

W. Scott Simpson, U.S. Dep't Justice, Civil Division, Washington, DC, for Defendant U.S. Dep't of Education.

Marion R. Buchinder, Assistant Attorney General, New York City, for Defendant State Commissioner of Education.

Marilyn Richter, Assistant Corporation Counsel, New York City, for Defendant Chancellor and Board of Education.

Kevin T. Baine, Williams & Connolly, Washington, D.C., for Defendant–Intervenors, Rachel Agostini, et al.

GLEESON, District Judge:

The Committee for Public Education and Religious Liberty ("PERL"), together with several individual state and federal taxpayers, brings this case against the Secretary of the United States Department of Education, the Commissioner of Education for the State of New York, the Chancellor of New York City schools and the Board of Education of the City of New York (the "Board of Education" or the "Board"), alleging that public funds are being used in violation of the First Amendment of the United States Constitution and of Article XI of the New York State Constitution.

The program at issue provides federally-funded remedial instruction and support services to educationally disadvantaged elementary and secondary school students in New York City. The present version of this program was devised in response to the Supreme Court's decision in *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), which invalidated New York's previous program. Plaintiffs claim that the amended program violates the Establishment Clause. Defendants, joined by parents of religious school students as defendant-intervenors, maintain that the current program avoids any impermissible effect or entanglement and is, therefore, not constitutionally infirm.

Both sides have moved for summary judgment on undisputed material facts. For the reasons stated below, the defendants' and defendant-intervenors' motions are granted and plaintiffs' motion is denied.

## BACKGROUND

### A. *Chapter 1 Legislation and Services*

Since 1965, Congress has enacted a series of laws (referred to here as "Chapter 1") that provides federal funding for remedial educational and support services for certain elementary and secondary school students residing in low-income areas.[1] Chapter 1 services are financed by the federal government and provided by local educational agencies ("LEAs," such as defendant Board of Education) to low income, low achieving children. 20 U.S.C. § 2722. To be eligible for educational assistance, a child must be both economically and educationally disadvantaged. A child is economically disadvantaged if she resides in an area that has a high concentration of low-income families, and she is educationally disadvantaged if she is progressing at a level below normal for her age. 20 U.S.C. §§ 2723, 2724. New York City's plan implementing Chapter 1 provides supplemental remedial instruction in math, reading and English as a Second Language ("ESL"). (Declaration of Margaret O. Weiss, ¶ 14.)

The program is intended to reach eligible students regardless of whether the students attend public or private schools.[2] The LEAs must "make provisions for including special educational services and arrangements (such as dual enrollment, educational radio and television, computer equipment and materials, other technology, and mobile educational services and equipment)," in which private school children can participate. Title 20 U.S.C. § 2727(a). This section further requires that "[e]xpenditures for educational services and arrangements pursuant to this

1. The first such program was created by Title I of the Elementary and Secondary Act of 1965, 20 U.S.C. § 2701. Title I was recodified by Chapter 1 of the Education Consolidation and Improvement Act of 1981, Pub.L. No. 97–35, which, in turn, was superseded by the Improving America's Schools Act of 1994, Pub.L. No. 103–382. Both parties agree that the basic provisions of these laws have remained the same since 1965. The one notable addition in the latest set of amendments is 20 U.S.C. § 2727(d), which allows for extra funding to be used to conform Chapter 1 programs to the constraints of *Aguilar*.

Section 2727(d) and other relevant provisions are discussed below.

2. In 1993–94, approximately 22,000 of the roughly 259,000 students served by the Chapter 1 program attended private schools. Virtually all of these schools are affiliated with religious organizations. Approximately 86% are Catholic schools, 8% are "Hebrew day schools," and the remaining 6% of the schools are affiliated with Greek Orthodox, Lutheran, Episcopalian, Ukrainian Orthodox and other denominations. (Plf.Exh. 1).

section for educationally deprived children in private schools [be] equal (taking into account the number of children to be served and the special educational needs of such children) to the expenditures for children enrolled in the public schools of the local educational agency." Section 2727 and its implementing regulations require that private school students receive services "comparable" to those provided to public school students. (Weiss Decl., ¶ 6.)[3]

From the program's commencement in 1965, defendant Board of Education, as a participating LEA, has used the earmarked funds to finance additional classes, counselors and instructors for all eligible children. Chapter 1 funds for the City of New York are administered through the Chancellor of the Board of Education. (Weiss Decl. ¶ 10.) Eligible students attending public schools have been, and continue to be, instructed in the schools that they regularly attend, by being pulled out of their regular classes to attend remedial instruction sessions. Currently, additional methods of combining remedial and regular class instruction are being pursued in public schools, such as the "push-in" or "pull-aside" methods, by which a remedial education teacher gives individualized instruction during a regular class session. (Declaration of Michelle I. Nowosad, ¶¶ 19–27; Declaration of Samuel Corsi, ¶¶ 3–4.) Prior to 1985, private school students generally received Chapter 1 services in separate classrooms in their schools.[4]

B. *Legal Challenges To Public Teaching In Private Schools*

In 1976, the National Coalition for Public Education and Religious Liberty brought an action in the Southern District of New York to enjoin the Chapter 1 program insofar as it provided services in non-public religious schools. A three-judge court held that New York's Chapter 1 program did not violate the

Establishment Clause. *Nat'l Coalition for Pub. Educ. & Religious Liberty v. Harris,* 489 F.Supp. 1248 (S.D.N.Y.), *appeal dismissed,* 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980).

In 1978, another action was filed in this district by six federal taxpayers[5] challenging the City's Chapter 1 program. *Felton v. Secretary, U.S. Dep't of Educ.,* No. 78–CV–1750 (E.D.N.Y.). After the parties stipulated to adopt the factual record of *Harris,* Judge Neaher granted the defendants' motion for summary judgment. The Second Circuit reversed, holding that the Establishment Clause precludes the funding of any program that sends publicly-paid teachers into religious schools. *Felton v. Secretary, U.S. Dep't of Educ.,* 739 F.2d 48 (2d Cir.1984). The court stated that "public funds can be used to afford remedial instruction or related counseling services to students in religious elementary and secondary schools only if such instruction or services are afforded at a neutral site off the premises of the religious school." *Id.* at 64.

The Supreme Court granted certiorari in the *Felton* case and rendered a decision on July 1, 1985. *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). On the same day, it decided a similar case from the Sixth Circuit, *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). The Court struck down the federally-funded program challenged in *Grand Rapids* and invalidated the New York Chapter 1 program for private school students challenged in *Aguilar.*

In *Grand Rapids,* the "shared-time" program at issue involved public school teachers, paid by state funds, teaching certain "secular" subjects in religious schools. The subjects ranged from remedial courses to "enrichment" courses such as home economics,

---

3. Recent amendments express this requirement as mandating that services be provided "equitably" to eligible public and private school students. (Weiss Decl. ¶ 7; 20 U.S.C. 2727(a); (b)(2).)

4. Early experiments with after-school Chapter 1 programs for schoolchildren proved unsuccessful, since both students and teachers were tired

at the end of the day and thus, both attendance and attention lagged. (Weiss Decl., ¶ 18; Plf. Exh. 3, ¶¶ 17–18.)

5. *See Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (taxpayers have standing to sue to enjoin use of public funds in violation of the Constitution).

arts and crafts and languages. The classes were offered in the non-public schools, of which 40 out of 41 were "pervasively sectarian." Because the Establishment Clause proscribes " 'sponsorship, financial support, and active involvement of the sovereign in religious activity,' " *Grand Rapids,* 473 U.S. at 381, 105 S.Ct. at 3221 (quoting *Comm. for Pub. Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973)), the Court held that there can be no public support of a pervasively sectarian enterprise. It found that the program in *Grand Rapids* amounted to such public support, and it thus impermissibly advanced religion in three ways. First, there was the possibility that publicly-paid teachers might "become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs." *Id.* at 385, 105 S.Ct. at 3223. This danger existed because the teachers' presence in a pervasively religious environment might "overtly or subtly" influence them to "infuse the supposedly secular classes they teach" with a religious message. *Id.* at 387, 105 S.Ct. at 3224. Second, the *Grand Rapids* program created a "crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school." *Id.* at 385, 105 S.Ct. at 3223. Finally, the Court found the program in *Grand Rapids* to be constitutionally infirm because it had the effect of "directly promoting religion by impermissibly providing a subsidy to the primary religious mission of the institutions." *Id.* While noting that a law can permissibly confer an incidental benefit on a religion, the Court characterized the *Grand Rapids* scheme as state support of religion. The Court explained that since such support frees the pervasively sectarian school from the need to use its own funds for "secular" classes, a religious school so funded has more money to use for religious purposes. In such a case, the state is, in effect, subsidizing the schools' religious goals.

In *Aguilar,* the Court concentrated not on the impermissible promotion of religion, but on the excessive entanglement that was required to prevent any such impermissible effect. *Aguilar,* 473 U.S. 402, 105 S.Ct. 3232. Although it recognized that New York's Chapter 1 program had been effective and successful in its permissible, indeed praiseworthy, goal of providing assistance to the educationally disadvantaged, the Court nevertheless held that the program as administered was constitutionally flawed. To the extent that New York's Chapter 1 program involved public school teachers instructing in secular subjects within religious schools, the Court called the program "very similar" to the program in *Grand Rapids,* and held that the program was unconstitutional for the reasons set forth in that case. *Id.* at 408, 105 S.Ct. at 3235–36. The Court noted, however, that unlike the School Board in *Grand Rapids,* New York's School Board had set up a supervisory system designed to monitor the religious content of publicly-funded classes in religious schools. *Id.* at 409, 105 S.Ct. at 3236. The Court found that the existence of this monitoring system, while perhaps ameliorating the constitutional violation on one level, created a violation on another level. Even if the supervision curtailed any improper religious sponsorship by preventing state-funded religious indoctrination, the very process of supervising teachers in religious schools constituted an improper entanglement. "[T]he detailed monitoring and close administrative contact required to maintain New York City's [Chapter 1] program can only produce 'a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize.' " *Id.* at 414, 105 S.Ct. at 3238 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)). The Court found that excessive entanglement resulted both from the administrative contacts between public and religious school authorities required to run a successful Chapter 1 program within private schools and from the supervision by public authorities over public teachers working within the religious schools. *Id.* at 413, 105 S.Ct. at 3238.

Thus, *Aguilar* and *Grand Rapids* effectively precluded any publicly-funded teaching on the premises of religious schools. In the wake of those decisions, the Board of Education was forced to abandon its program of

providing Chapter 1 classes in private religious schools.[6]

## C. The Alternative Plan

After the Supreme Court's decision in *Aguilar*, Congress enacted the Elementary and Secondary School Improvement Amendments, which provided more money to local authorities to supply Chapter 1 services to private school students in compliance with *Aguilar*. *Pulido v. Cavazos*, 728 F.Supp. 574 (W.D.Mo.1989), *aff'd in part, rev'd in part on other grounds*, 934 F.2d 912 (8th Cir.1991). This amendment contained specific provisions aimed at allowing for and financing alternative delivery of Chapter 1 services to eligible private school programs. Recognizing that the cost of delivery of Chapter 1 services to private schoolchildren would increase after the *Aguilar* decision, 20 U.S.C. § 2727(d)(4) provides for a special appropriation of federal funds to defray expenses necessary to provide remedial instruction to religious school students in a constitutionally permissible way. A New York State statute similarly provides for special "compliance costs" funding for Chapter 1 programs.

In the wake of *Aguilar*, the U.S. Department of Education promulgated a series of guidelines for implementing Chapter 1 programs for private school children. These guidelines prohibited in-school instruction by public school teachers, but authorized off-premises mobile instructional units and computer instruction where possible. (Declaration of Thomas W. Fagan, Exh. B–D). The guidelines further instructed LEAs to deduct any additional costs of providing Chapter 1 services to private school children from the LEA's total Chapter 1 allocation, *i.e.*, prior to apportionment per student. This method, known as "off the top" cost allocation, was intended to fulfill the requirement of 20 U.S.C. § 2727(a) and (b)(1) that Chapter 1 services be provided on an equitable basis to all school children, whether attending public or private schools. *See Barnes v. Cavazos*, 966 F.2d 1056, 1060 (6th Cir.1992).

The New York State Department of Education also issued guidelines on the matter. (Weiss Decl., Exh. B). These guidelines endorsed the options of offering classes at religiously neutral sites (defined as "locations not under the control of any religious authority or organization") in mobile units (if not located on the premises of a sectarian organization) and on public school premises.

The Board of Education of the City of New York devised and implemented a new plan (the "Alternative Plan") to provide Chapter 1 services to religious school students consistent with *Aguilar*. The educational content of the Alternative Plan is identical to the plan invalidated in *Aguilar*—instruction to eligible students in remedial math, remedial reading and ESL—and makes use of four delivery options. First, religious school students are bused or otherwise escorted to a "matching" public school (one with available space and located no more than ten minutes away) for instruction. Because of the logistical difficulties involved in arranging for integrated classes (*see* Weiss Decl., ¶¶ 39–63), these classes are composed entirely of students from the private school. Second, classes are held in mobile instructional units ("MIUs")—vehicles outfitted as classrooms and parked on a public street near the private schools during the school day.[7] Third, classes are held in sites leased by the Board ("Leased Sites"), which are off-premises but near the private schools. Finally, computer-assisted instruction ("CAI") is provided (preferably in

---

**6.** However, in the years since the Supreme Court's decision in *Aguilar*, the landscape of Establishment Clause decisions has significantly changed. The life expectancy of *Aguilar* itself is, to put it mildly, subject to question. Indeed, three justices of the Supreme Court have declared that *Aguilar* "should be overruled at the earliest opportunity." *Board of Education of Kiryas Joel v. Grumet*, 512 U.S. 687, ——, 114 S.Ct. 2481, 2515, 129 L.Ed.2d 546 (1994) (Scalia, J., dissenting (joined by Chief Justice Rehnquist and Justice Thomas)). A fourth, who dissented in *Aguilar*, has expressed a desire to reconsider it and has strongly indicated that it should be overruled. *Id.* at ——, 114 S.Ct. at 2498 (O'Connor, J., concurring). Finally, a fifth justice has stated that the *Aguilar* decision "may have been erroneous," and that it may be necessary to reconsider it "in the interest of sound elaboration of constitutional doctrine." *Id.* at ——, 114 S.Ct. at 2505 (Kennedy, J., concurring).

**7.** Photographs of MIUs appear at Weiss Decl., Exh. D.

addition to off-premises, face-to-face instruction) through computer terminals located in a designated room in the religious school or through laptop computers sent home with religious school students. (Weiss Decl, ¶¶ 101, 114, 117, 121.) [8]

The mix of these delivery methods changed somewhat from 1986 to 1991.[9] Because of overcrowding in the public schools, and because of other concerns related to transporting students from private to public schools during the day, this method was used less frequently, and CAI and MIU instruction were used more frequently. (Weiss Decl., ¶¶ 44, 48; see also ¶¶ 39–63.)

Each option carries a different price tag.[10] The first—classes held in public schools—is the least expensive. The School Board pays nothing to use public school classrooms for Chapter 1 purposes. Since students are transported from private schools to public schools by buses already provided to the School Board during the school day, the cost of taking religious school children to and from these Chapter 1 locations is for the most part aggregated with general busing costs for the School District. (Weiss Decl., ¶¶ 41, 171.) The same is true for transportation to and from Leased Sites, but, unlike classrooms in public schools, the Board must pay to use the space in leased buildings. During the 1990–91 school year, the Board paid a total of $280,402 to lease these sites. (Weiss Decl., ¶ 190.) Non-instructional costs associated with CAI amounted to $225,711 in that same school year. (Weiss Decl, ¶ 197.) The provision of MIUs is significantly more expensive than any other delivery method, since each MIU is leased by the Board at a cost of $106,934 per year (including driver, garage, insurance, maintenance and repairs). In the 1990–91 school year, the Board spent a total of $11,126,541 to lease MIUs. (Weiss Decl., ¶¶ 66, 184.)

### D. *The Current Constitutional Challenge*

Plaintiffs PERL and taxpayers Florence Flast, Helen Henkin, Hazel Smith, Denise Krouser and Christina Walker, attack the constitutionality of the Alternative Plan. They allege that it violates the United States and New York State Constitutions by impermissibly supporting religion and/or entangling government and religion. According to plaintiffs, each of the four delivery options in the Alternative Plan is constitutionally flawed. Plaintiffs also challenge the practice of taking additional costs for delivery of Chapter 1 services to religious school students "off the top" of Chapter 1 funds, calling the practice an impermissible subsidy of religious institutions.

Plaintiffs attack the first delivery option—providing instruction to religious school students in public schools—because the religious school students are kept separate from the public school ones.[11] Citing articles documenting community protests surrounding various segregated class programs, plaintiffs suggest that separate classes of religious and public school students, even if both these classes are held within the public school building, violates the Constitution in that it creates the very community divisiveness and "political entanglement" that the Establishment Clause seeks to prevent. Furthermore, argue plaintiffs, the Second Circuit in *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235 (2d Cir.1986), found that the segregation of religious school students within the public school involved in that case was unconstitutional. In *P.S. 16*, the court declared the segregated program unconstitutional

---

**8.** CAI terminals and laptops are electronically and physically configured so as to prevent them from being used for any purpose other than Chapter 1 instruction. (Weiss Decl, ¶ 107–113, 118–120).

**9.** The parties in this case stipulated that discovery would be limited to the dates up to and including the 1990–91 school year.

**10.** A 6.5% general administrative charge is added to total Chapter 1 costs. This charge is taken "off the top" of funds allocated for Chapter 1

purposes. (Weiss Decl., ¶¶ 202–204.) The total administrative charge in 1990–91 was $20,910,-171. (Weiss Decl., ¶ 205.)

**11.** Although plaintiffs allege that separation of religious school students is "for religious reasons" (Plf.Mem. at 12), this allegation is unsupported, and defendants have supplied affidavits stating that this separation is not improperly motivated, but instead reflects legitimate secular concerns. (Weiss Decl., ¶¶ 53–63, 155; *see also* Nowosad Decl., ¶¶ 20, 28–34.)

both because of the "inherently divisive" nature of segregation and because segregation of Hasidic children evidenced state support for the Hasidic doctrine of separatism.

Second, plaintiffs attack the constitutionality of the Board's use of MIUs because of the relatively greater cost this method entails and because, plaintiffs contend, MIUs are "physically and educationally" associated with the religious school and thus create the same constitutional problems addressed in *Aguilar* and *Grand Rapids*. Plaintiffs make much of the fact that an MIU is not equipped with restroom, lunchroom or infirmary facilities, and that some surplus equipment used by Chapter 1 instructors is stored in the religious school the MIU services, since there is not enough room for long-term storage in the MIU itself. (Weiss Decl., ¶¶ 75–76.) The plaintiffs also contend that there is not much difference between going from classroom to classroom inside the religious school, as in *Aguilar*, and going from a classroom inside the religious school, out the door, and immediately into a mobile classroom parked at the curb. Plaintiffs claim that MIUs amount to mere annexes of the religious schools. Because the MIU is clearly labeled as property of the City of New York (Weiss Decl., ¶ 173 and Exh. D), plaintiffs allege that, like the supervisory system struck down in *Aguilar*, the clear association of MIUs with the state creates excessive entanglement between church and state.

Third, plaintiffs allege that the Leased Sites are not neutral and that classes held at these sites therefore violate the Establishment Clause for the reasons set forth in *Aguilar* and *Grand Rapids*. The majority of the sites leased by the Board are indeed owned by a religious organization, often the same Catholic parish that funds the particular private school. Defendants have supplied affidavits stating that all religious symbols have been removed from every Leased Site and that each site is clearly labeled as and used only for a Chapter 1 classroom.[12] Plaintiffs contend that mere religious ownership creates a sectarian environment in

Leased Sites, rendering them non-neutral. Plaintiffs also argue that paying religious institutions a fee under lease agreements constitutes a direct state subsidy to religion.

Fourth, plaintiffs challenge CAI as advancing religion and improperly entangling church and state. According to plaintiffs, *Aguilar* and *Grand Rapids* suggest that entanglement is inherent in the provision of publicly funded instruction inside a religious school building regardless of whether a teacher is physically present or instructs from another location via computer. There are no teachers present in the religious school who instruct in conjunction with CAI; instead, instruction occurs through computer terminals located in the schools and linked by modem or dedicated phone line to the Board of Education central office. (Weiss Decl., ¶¶ 100, 102.) There is, however, a Board-employed technician who is present in the room where CAI terminals are located. Although the technician is directed to limit his assistance to turning the terminals on and off and keeping order among the students (Weiss Decl., ¶ 104–105), plaintiffs contend that the presence of such a public employee is impermissible. Plaintiffs allege the system of CAI thus violates the Establishment Clause just as instruction in private schools by physically present teachers would. Plaintiffs further contend that CAI effectively subsidizes the religious function of sectarian schools by taking over their responsibility for teaching secular subjects.

Finally, plaintiffs argue that the use of additional funds to pay the "compliance costs" of providing Chapter 1 services to religious school students violates both the Establishment Clause—by effectively subsidizing religious schools—and the mandate of Chapter 1 itself—by failing to treat public and private school children equitably. Part of this dispute centers on the proper interpretation of the requirement of 20 U.S.C. § 2727 and Department of Education regulations mandating that services be provided equitably and equally among private and public school children. Plaintiffs contend

---

**12.** Defendants state that all potential leased sites were inspected and that over 140 potential sites were, in fact, rejected by the Board because they were not religiously neutral. (Weiss Decl., ¶¶ 86–88.)

that equal treatment, required by Chapter 1, is not provided when the state spends more per pupil for religious school students. Defendants rejoin that the equitable treatment provision mandates the current system of taking extra costs of delivery of services "off the top," since otherwise, religious school students would receive less money per child for instructional purposes.

## DISCUSSION

### A. The "Effects" Cases

■ The First Amendment commands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." [13] This prohibition reflects, among other things, the desire of the early settlers of this country to worship freely and to be free from laws which compelled public support of government-favored churches. See Everson v. Board of Education of Ewing, 330 U.S. 1, 8–9, 67 S.Ct. 504, 507–08, 91 L.Ed. 711 (1947) (citing, inter alia, Macaulay, History of England, vol. I, ch. 2, 4 (1849); Sweet, Religion in Colonial America, 320–22 (1942)). The Supreme Court, in interpreting the Establishment Clause, has noted that the constitutional religion clauses were framed with the same intent as was the Virginia Bill for Religious Liberty, which was written by Thomas Jefferson. See Everson, 330 U.S. at 13, 67 S.Ct. at 510; Reynolds v. United States, 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878). One of the purposes of the Virginia Bill for Religious Liberty was to protect people from being taxed to support religion. Everson, 330 U.S. at 13, 67 S.Ct. at 510; Hening, Statutes of Virginia, 84 (1823). The Supreme Court, in reviewing the purposes of the Establishment Clause, has held that the clause means

> at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.... No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or

whatever form they may adopt to teach or practice religion.

Everson, 330 U.S. at 15–16, 67 S.Ct. at 511. The First Amendment prevents the government not only from advancing a particular religion, or religion in general, but from inhibiting any or all religions. Everson, 330 U.S. at 16, 67 S.Ct. at 511–12. The government is required to remain neutral, neither granting nor denying benefits to religious institutions on the basis of their religion. Id.

■ In the context of state supported primary education coexisting with religious schools, this requirement of neutrality presents a uniquely difficult problem in balancing private school benefits on the wall between church and state. On the one hand, services provided to all schoolchildren necessarily cause, at least to some degree, a benefit to accrue to religious schools, and, therefore, to the religion itself. Very strictly speaking, any such benefit flowing from the government to religion has some "effect of advancing religion." On the other hand, denying children the access to general benefits because of their attendance at church-sponsored schools may effectively punish religious exercise and thus have the effect of inhibiting religion. In its effort to reconcile the mandate of governmental neutrality with the reality that every government act or omission in this context will have some "effect," the Supreme Court has held that the preclusion of an impermissible effect should not be applied so rigidly as to disallow indirect benefits to religious institutions flowing from the provision of religious-neutral, general governmental services. See Everson, 330 U.S. at 16–17, 67 S.Ct. at 511–12. Accordingly, a statute will not be struck down merely because it indirectly benefits religion. See, e.g., Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (upholding the Adolescent Family Life Act, which recruited religious organizations to teach teenagers values relating to sexuality and, specifically, to promote sexual abstinence); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (upholding statute providing for the release of public school pupils from

---

13. The First Amendment was made applicable to the states by the Fourteenth Amendment. Mur-

dock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

school attendance to attend religious classes and state enforcement of attendance rules for these religious classes).

### 1. *Permissible Benefits to Schoolchildren*

In *Everson,* the Court upheld a New Jersey statute providing for reimbursement to parents of all schoolchildren for the costs associated with busing their children to school. 330 U.S. 1, 67 S.Ct. 504. After finding that the law applied generally, without regard to whether the children attended religious or secular institutions, the Court affirmed its constitutionality. Comparing the bus fares to public funding of fire and police protection, the Court explained that depriving religious school students of general services would impermissibly "handicap religions." The Court found that the benefit flowing to the religious schools by publicly funding religious school students' bus fares was indirect and did not, therefore, constitute state advancement of religion. *Id.*

Twenty-two years after *Everson* the Court upheld the constitutionality of another generally-provided governmental service that benefitted religious schools, perhaps more directly than did the statute in *Everson.* In *Board of Education of Central School District v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court found that a New York statute requiring school districts to purchase and loan out textbooks to both religious and public school students was not a "law respecting an establishment of religion" in violation of the First Amendment.[14] The Court rejected plaintiffs' attempt to distinguish books—as critical to the "teaching process" which, in religious schools, includes teaching religion—from buses, which have no "instructional role." *Id.* at 245, 88 S.Ct. at 1927. Since the state could easily ensure that the books provided were secular, the Court noted that the law would not have the

effect of advancing religion at the public expense. The Court explicitly refused to hold that "all teaching in a sectarian school is religious or that the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." *Id.* at 248, 88 S.Ct. at 1929.

Reading these early "effects" cases together, the First Amendment permits state provision of goods and services if the provision is done neutrally, *i.e.,* to all schoolchildren, and if the goods and services provided cannot be converted to assist in religious indoctrination. On the other hand, laws that provided goods and services that could aid in religious instruction have been struck down by the Supreme Court as having an impermissible effect. *People of the State of Ill. ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), for example, prohibited the practice of using state's tax-supported public school buildings for teaching religious classes. Similarly, although reimbursing parochial schools for costs incurred in administering state-prepared standardized tests was constitutional, *Comm. for Pub. Educ. and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), providing reimbursement for teacher-prepared tests was not, as such tests could be used for religious instruction. *Levitt v. Comm. for Pub. Educ. and Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). Although textbook loans are constitutionally permissible, *see Allen,* the Court has struck down statutes authorizing loans of equipment, staff personnel and counselors to private schools, holding that such persons and materials could be diverted to religious uses. *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977),

---

14. The Court noted that the real benefit of loaning textbooks accrued not to the parochial school, but to its students, since ownership of the books remained with the state. Although both *Everson* and *Allen* contained dicta to the effect that the benefits are permissible if provided to students rather than to religious institutions, an interpretation of these cases as holding that the constitutionality of a statute hinged on such a distinction was called into doubt by the Court's

decision in *Walz v. Tax Comm'n of City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). *But see Meek v. Pittenger,* 421 U.S. 349, 365–66, 95 S.Ct. 1753, 1763–64, 44 L.Ed.2d 217 (1975) and *Grand Rapids,* 473 U.S. at 393–94, 105 S.Ct. at 3227–28 (both distinguishing between "indirect aid" where benefits are provided to religious school students and "direct aid" to religious schools).

the Court upheld statutory provisions for textbook loans, reimbursements for standardized test administration and scoring, and the provision of diagnostic and therapeutic services to parochial schools, but struck down a loan of equipment and the provision of buses for field trips because these goods and services could be used for religious purposes.

### 2. Subsidies of Religious Schools' Functions

In a slightly different approach to the question of improper effect, the Court has invalidated statutes which provided public funds to pay the costs of running a private school as impermissibly subsidizing the religious function of such an institution. In *Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), the Court found that state reimbursements to non-public school parents for tuition paid to send a child to a religious school violated the Establishment Clause because the statute was, in effect, a direct subsidy to private, pervasively sectarian schools. If the state funds a service for which the private religious school is otherwise financially responsible, the effect has been characterized as sponsorship or financial support of religion. This line of reasoning led the Court to invalidate not only state payment of tuition, but public maintenance and repair grants to parochial schools and tax exemptions given to private school parents. *Comm. for Pub. Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).[15]

In *Meek v. Pittenger*, the Court invalidated a statute providing services to religious schools not only because such services could be converted to religious uses, but also because the statute involved "massive aid" to the pervasively sectarian schools that was

"neither indirect or incidental." 421 U.S. at 365, 95 S.Ct. at 1763. The Court in *Meek* held that even when state aid is earmarked for secular purposes, it has the impermissible primary effect of advancing religion "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Id.* at 366, 95 S.Ct. at 1763 (internal quotations omitted). Since the services at issue were provided directly to a private school that was pervasively sectarian, the Court found that the provision of such services constituted a subsidy of religion. *Meek* extended the "subsidy" type of effects analysis by holding that any appreciable aid provided directly to a significantly religious organization was constitutionally barred. The *Meek* decision thereby revived the distinction between benefits flowing to religious school students and benefits flowing to the religious school itself. *See supra*, note 14.

### B. The Entanglement Cases

#### 1. Aid Directly to Religious Organizations

In *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Court upheld a New York statute which exempted from property tax real property owned by religious organizations. After acknowledging that a law that provides a benefit to a religious organization does not necessarily violate the Constitution (citing *Everson* and *Allen*), the Court in *Walz* held that a tax exemption for churches did not involve any purpose to advance religion, nor did it constitute financial support for the religion by the state. Although the Court recognized that "a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed adminis-

---

**15.** A different legal analysis has been used to determine the effect of grants to religious colleges. The Supreme Court has determined that religious colleges are not "pervasively sectarian enterprises" and that aid to such colleges, even if constituting a subsidy (taking over a cost for which the school is responsible), does not necessarily violate the Establishment Clause. *See Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (finding that annual aid payments to a religious university are constitutional because there is no impermissible

effect when the institution is not "so permeated by religion" that secular cannot be separated from religious instruction); *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (holding that public funding of construction projects for religious colleges is constitutional because the colleges are not significantly sectarian); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (finding construction grants not violative of the First Amendment, since the colleges involved were not religiously "permeated").

trative relationships for enforcement of statutory or administrative standards," it concluded that "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Walz*, 397 U.S. at 674, 90 S.Ct. at 1414. Although the tax exemption upheld in *Walz* left the sectarian institution with more money to pursue its religious goals, the Court declined to find the exemption violative of the Constitution based on this "subsidy" effect.

While the distinction between a direct money subsidy and a financial benefit via a tax exemption is elusive, it was not the main concern in *Walz*, which focused more on the entanglement of church and state.[16] *Walz* attempted to balance entanglement concerns with the neutral effect requirement and concluded that rigid adherence to a neutrality standard is not required where excessive entanglement would result. *Id.* at 669, 90 S.Ct. at 1411–12. Paying a religious institution a money subsidy would not only have a non-neutral effect, but could entangle government and religion. Exempting a religious institution from paying taxes has the same non-neutral effect; however, it avoids the problem of entanglement. The paradox that the state might in certain cases avoid entanglement only by benefitting a religious institution was resolved by reference to *Everson* and *Allen*, which allowed some non-neutral "effects" to escape constitutional condemnation. Even a direct benefit accruing to a religious organization, according to *Walz*, is permitted if it allows church and state to maintain a healthy distance. *Id.* at 676, 90 S.Ct. at 1414–15.

### 2. The "Lemon Test" and Supervision as Entanglement

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court promulgated a three-prong approach to Establishment Clause challenges (purpose, effect and entanglement) that has generally remained the applicable standard in such cases despite chronic criticism.[17] In *Lemon*, along with its companion case; *Earley v. DiCenso*, the Court struck down a statute that provided salary supplements to religious school teachers who taught only secular subjects and reimbursement to religious schools for teachers' salaries, textbooks and instructional materials. Since the laws at issue in *Lemon* created impermissible entanglement, the Court did not reach the question whether they also had the improper effect of advancing religion.

The Court in *Lemon* acknowledged that it is "a blurred, indistinct and variable barrier" which divides church from state. *Id.* at 614, 91 S.Ct. at 2112. Recognizing that a statute will not be invalidated merely because it provides an indirect benefit to religion, the Court nevertheless found that if a benefit requires government oversight in order to ensure such a neutral effect, it violates even this "blurred" separation. Unlike books, teachers are of mutable instructional capacity. As the Court put it, "teachers have a substantially different ideological character from books." *Id.* at 617, 91 S.Ct. at 2113. The Court held that since

[t]he State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion ... [a] comprehensive discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal

---

**16.** In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), for example, the Court described *Walz* as constituting an effort to "confine rather than enlarge the area of permissible state involvement with religious institutions." *Id.* at 614, 91 S.Ct. at 2112.

**17.** The defendants note that five members of the current Supreme Court have expressed their dissatisfaction with the *Lemon* test, especially as applied in *Aguilar* and *Grand Rapids.* For exam-

ple, in *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), Justice Scalia remarked: "Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again." *Id.* at 398, 113 S.Ct. at 2149–50 (Scalia, J., concurring).

beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.

*Id.* at 619, 91 S.Ct. at 2114.

Whereas entanglement was avoided in *Walz,* in *Lemon,* the benefit created it. *Id.* at 621, 91 S.Ct. at 2115. Once again, the Court found that the provision of mutable goods and services that could potentially be used for religious instruction violated the Establishment Clause, if not because of an impermissible effect, then because of the necessary supervisory entanglement between church and state.

### 3. Political Conflict as Entanglement

In finding that the challenged statutes improperly entangled government and religion, *Lemon* referred not only to the need for supervision inherent in the statutes, but also to a "broader base of entanglement" created by statutes that are politically divisive. *Id.* at 622, 91 S.Ct. at 2115–16. The Court opined that since "political division along religious lines was one of the principal evils against which the First Amendment was intended to protect," a statute which engendered this type of political strife could be characterized as causing excessive entanglement. *Id.* In later cases, however, the Court, while recognizing that political entanglement is undesirable, noted that this type of entanglement is not the determinative factor. "While the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a 'warning signal' not to be ignored." *P.E.R.L. v. Nyquist,* 413 U.S. at 797–98, 93 S.Ct. at 2978. *See also Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (noting that mere political divisiveness cannot invalidate the inclusion of a religious symbol in a public display).

### C. Chapter 1 Services And The Establishment Clause

#### 1. Grand Rapids and Aguilar in Context

In *Grand Rapids,* the Court first found that the challenged services provided by the state, *i.e.,* teachers of secular subjects in private schools, were mutable in their instructional character and thus could be used for religious indoctrination. *Id.* at 386–388, 105 S.Ct. at 3223–3225. The Court highlighted the danger that environmental pressures of teaching in a religious school could cause public teachers, consciously or not, to teach in such a way as to endorse and promote the religious mission of the sectarian schools. This reasoning followed that of several previous "effects" cases holding that certain goods cannot be provided to sectarian schools by the state because these goods could possibly be used in religious instruction. *See McCollum,* 333 U.S. 203, 68 S.Ct. 461 (buildings); *Levitt,* 413 U.S. 472, 93 S.Ct. 2814 (teacher-prepared tests); *Wolman,* 433 U.S. 229, 97 S.Ct. 2593 (equipment and field trip transportation).

Second, as in *Meek, Sloan* and *Nyquist,* the Court in *Grand Rapids* found an impermissible effect arising from public assumption of financial responsibilities of the religious schools, to wit, the teaching of secular subjects. 473 U.S. at 393, 105 S.Ct. at 3227–28. The Court found that state provision of teachers of secular subjects supplanted the school's responsibility to provide such teachers and therefore created a subsidy to a religious institution. Like *Meek,* the Court sought to differentiate between "indirect aid cases"—where the benefit provided was remote or incidental—and "direct aid cases"—where the state directly supports a religious institution.

Finally, *Grand Rapids* announced that a "symbolic union" between church and state could constitute an impermissible effect to invalidate a statute. The Court stated that "[g]overnment promotes religion as effectively [as when financing indoctrination] when it fosters a close identification of its powers and responsibilities with those of any—or all—religious dominations." *Id.* at 389, 105 S.Ct. at 3225. To support this application of the effect prong of the *Lemon* test, the Court referred to the concurring opinion in *Lynch v. Donnelly,* 465 U.S. 668, 688, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) (O'Connor,

J., concurring).[18] *Lynch*, and presumably *Grand Rapids*, did not perceive of a "symbolic union" arising out of monetary support, but out of the appearance of government and religion acting in concert. In this regard, *Grand Rapids* also cites to *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125–126, 103 S.Ct. 505, 510–512, 74 L.Ed.2d 297 (1982), which held that the "mere appearance of joint legislative authority by Church and State" can create an impermissible symbolic union. The Court in *Grand Rapids* found the appearance of church and state acting in concert arose from the fact that both public and religious classes were held "in the same religious school building and both are largely composed of students who are adherents of the same denomination." 473 U.S. at 391, 105 S.Ct. at 3226. The Court noted that holding public and religious classes in the same building made it difficult for students to "discern the crucial difference" between permissible state support of secular education and proscribed government endorsement of religious instruction. *Id.* The Court noted, in a footnote, that a "program providing similar services at neutral sites off the premises of the religious school" was upheld in *Wolman v. Walter*, 433 U.S. at 244–48, 97 S.Ct. at 2603–06, suggesting that this method would not create the fatal "symbolic link." *Id.* at 391 n. 10, 105 S.Ct. at 3226 n. 10.

As *Grand Rapids* proceeded from the reasoning in *Meek*, so *Aguilar* built on the analysis in *Lemon*. Like the statutes invalidated in *Lemon*, the Chapter 1 program challenged in *Aguilar* provided services to private schools that could be converted to religious instructional uses. *Aguilar*, 473 U.S. at 412, 105 S.Ct. at 3237–38. The Court found that the state would be required, in implementing such a program, to adopt a monitoring system to ensure that its teachers were not advancing the religious mission of the schools in which they taught. The Court concluded that this "ongoing inspection" requirement violated the First Amendment. *Id.* Specifi-

cally, the frequent administrative contacts between public school teachers and private school teachers and administrators could be anticipated in such a program, and this type of continuous, day-to-day involvement would entangle church and state. *Id.* at 413, 105 S.Ct. at 3238.

*Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), has refined the limits of the Establishment Clause jurisprudence in this area. In that case, the Court held that the Establishment clause is not a *per se* bar to placing a public employee in sectarian schools. That case permitted the state provision of a sign language interpreter, pursuant to the Individuals with Disabilities Act, for a hearing-impaired student attending a Catholic school. *Zobrest* echoed the reasoning of *Everson* and *Allen*, by holding that a program that provides governmental benefits to a broad class of citizens does not violate the Establishment Clause by reason of an indirect benefit accruing to a religious institution. *Zobrest*, 509 U.S. at 8, 113 S.Ct. at 2466. The Court noted that the statute creates no financial incentive for parents to choose a sectarian school since it does not make services available to students at private schools that are unavailable in public schools. *Id.* at 9, 113 S.Ct. at 2466–67.

The Court distinguished *Meek* and *Grand Rapids* in two ways: first, the programs in those cases were considered subsidies only because the public program relieved the religious schools of costs that they otherwise would have borne, whereas the religious school in *Zobrest* would not have provided a sign language interpreter in the absence of the state program; and second, an interpreter, unlike a teacher, does not instruct the students at public expense, but merely acts as a transmitter for the privately funded instruction.[19]

---

18. *Lynch* was not a case about support for private schools, but rather addressed, and upheld, the inclusion of a nativity scene in a city's Christmastime public display.

19. Justices Blackmun and Souter disagreed with the Court's characterization of an interpreter,

holding that interpreting services could be converted to assisting in religious indoctrination even easier than a slide projector or a map, the public provision of which was struck down by the Court in, *inter alia, Wolman*, 433 U.S. 229, 97 S.Ct. 2593.

## 2. The Comparability Requirement

In revising Chapter 1 programs in reaction to the *Aguilar* decision, state educational agencies were further influenced and constrained by the Supreme Court's decision in *Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), which dealt with the statutory requirement that Chapter 1 services be provided equally to private and public schoolchildren. The Court found that the services provided were required by the statute to be "comparable" (this requirement is currently phrased as "equitable"), but that this requirement did not mandate provision of identical services to religious school children. *Id.* at 421–23, 94 S.Ct. at 2285–86. In *Wheeler*, state law prevented the provision of publicly funded on-site instruction in religious schools. The Court, therefore, did not pass on whether such instruction violated the U.S. Constitution—*Aguilar*, of course, later held that it did—but found that off-site instruction for private school children could be "comparable" to on-site instruction in public schools if it was not inferior in educational quality. *Id.* at 422–24 & n. 17, 94 S.Ct. at 2286–87 & n. 17. Although the Court declined to comment on the constitutionality of various proposals, it noted that "although it may be difficult, it is not impossible under the Act to devise and implement a legal [Chapter 1] program with comparable services despite the use of on-the-premises instruction in the public schools but not in the private schools." *Id.* at 424, 94 S.Ct. at 2287.

## 3. The Courts of Appeals' Treatment of Post–Aguilar Cases

The Supreme Court's holding that comparable services could be achieved in non-identical programs for private and public school students, together with *Aguilar*'s bar of state funded on-site instruction, caused various state departments of education and LEAs to revise their Chapter 1 programs in the hope of complying with both the First Amendment and the statute's equal treatment goal. Four courts of appeals have heard challenges to these amended Chapter 1 programs, and all four have upheld the off-premises instructional programs as complying with the Constitution.

In *Pulido v. Cavazos*, 934 F.2d 912 (8th Cir.1991), taxpayers in Missouri sought to enjoin the use of public funds to provide Chapter 1 services to religious school children in mobile classrooms parked both on and off the premises of parochial schools. The district court concluded that parking mobile units on secular school property violated the Establishment Clause by creating a "symbolic union" between "federal funds and parochial schools." *Pulido v. Cavazos*, 728 F.Supp. 574, 588 (W.D.Mo.1989). The Eighth Circuit reversed, holding that the "on-site" bar of *Aguilar* included only instruction inside the school itself. *Pulido*, 934 F.2d at 923–24. The court rejected the arguments that classes in mobile units parked next to private schools were non-neutral locations, that they created a "symbolic union" between church and state, and that they subsidized religion by providing direct aid to the pervasively sectarian schools. Rather, because the mobile units involved were portable, separate from the parochial school building, not owned or controlled by the religious school, and free of any religious symbols or subjects, they were "physically and educationally separate from the functions of the parochial school, and religiously neutral." *Id.* at 919. Finally, the court rejected plaintiffs' contention that providing public services to private school students constituted a direct subsidy to religion. The program for parochial school children was substantively no different from the program provided to public school children and did not have the effect of endorsing religious views. Citing *Wolman*, 433 U.S. at 247–48, 97 S.Ct. at 2605–06, the court held that merely providing classes to students in religious schools does not impermissibly advance religion, even if the classes are composed entirely of religious school students. In addition, the court noted that *Wheeler* implied that parochial students could be provided with comparable services in such a way as to avoid constitutional difficulties. 417 U.S. at 419, 94 S.Ct. at 2284.

*Pulido* also declined to find that the Missouri Chapter 1 program created any entanglement. First, the court rejected the argument that the program entangled church and state by creating political conflict, noting that

" 'political divisiveness alone' cannot invalidate otherwise permissible conduct." *Pulido,* 934 F.2d at 921 (quoting *Lynch v. Donnelly,* 465 U.S. at 684, 104 S.Ct. at 1365). Unlike the challenged programs in *Lemon* and *Aguilar,* the Missouri Chapter 1 program did not involve instruction in a sectarian environment. Not only did this distinction suggest to the court that teachers in the Missouri program would be less likely to conform their instruction to the religious mores of the sectarian school, but the court specifically permitted supervision of these teachers outside of the private schools. The court found that public supervision of public teachers in public mobile units does not involve any church-state entanglement. *Pulido,* 934 F.2d at 921–22.

The Sixth and Seventh Circuits have also upheld the constitutionality of post-*Aguilar* Chapter 1 programs. *Barnes v. Cavazos,* 966 F.2d 1056 (6th Cir.1992); *Bd. of Educ. of City of Chicago v. Alexander,* 983 F.2d 745 (7th Cir.1992). Both cases affirmed a district court's finding that the substance and methods of the program in question presented no constitutional difficulty, and further found that the "off the top" method of funding the costs of conforming Chapter 1 programs to the *Aguilar* decision was constitutionally permissible.

In 1995, the Ninth Circuit approved an alternative Chapter 1 delivery system for private schoolchildren designed in the wake of *Aguilar.* In *Walker v. San Francisco Unified School District,* 46 F.3d 1449 (9th Cir.1995), the court stated that a program's constitutional validity is not determined by reference to the physical location in which benefits are provided to parochial school children, but whether there is government neutrality toward religion. *Id.* at 1457–58. Citing *Zobrest,* the court found that the Chapter 1 program neutrally provided a general welfare benefit to a broad class of people. *Id.* at 1458–59. It rejected plaintiffs' argument that parking mobile classrooms on parochial school property created an impermissible "symbolic union." *Id.* at 1459. To conclude that the mere proximity of government vans to religious schools would influence the religious content of a teacher's instruction

"would elevate the theoretical above the actual." *Id.* at 1460. The court also held that the amount of administrative cooperation between public and private school personnel required to ensure a successful Chapter 1 program did not amount to excessive entanglement of church and state. *Id.* at 1461. Regarding the question of state supervision to ensure religious neutrality, the court quoted *Wolman,* which held that "[i]t hardly can be said that the supervision of public employees performing public functions [in] public property creates an excessive entanglement between church and state." 433 U.S. at 248, 97 S.Ct. at 2605.

### 4. *"Off The Top" Funding and the First Amendment*

Each of the four circuit courts to consider the constitutionality of a post-*Aguilar* Chapter 1 program also concluded that the various funding mechanisms used, such as special appropriations and taking certain expenses "off the top," did not violate the Establishment Clause. The plaintiffs in *Pulido* contended that an "off the top" allocation creates political divisiveness that entangles the government and religion, amounts to public support of private school expenses, and further violates the Chapter 1 requirement of "equal" expenditures for public and private school students. 934 F.2d at 924. *See* 20 U.S.C. § 2727(a). The Eighth Circuit held that federal taxpayers had no standing to challenge administrative allocation of funds as being violative of § 2727(a). *Pulido,* 934 F.2d at 924 n. 7. As for the constitutional challenges to Chapter 1 funding, the court found that a statute is not unconstitutional merely because the generally provided, neutral benefit actually causes more money to be spent (per student) on private than public schools. *Id.* at 925. In light of *Wheeler*'s exhortation that private and public schools receive comparable services, the court held that the First Amendment does not require absolute equality of expenditure per student, and that Chapter 1 demands only that the resulting programs be of comparable educational quality. *Id.* at 925–26. The Eighth Circuit therefore held that, although it may cost more to provide Chapter 1 services to private school children, this additional cost is

required to give the students comparable services and does not create a constitutional flaw in the program. *Id.* at 927–28.

The Sixth Circuit in *Barnes* applied a "grossly disproportionate test" in assessing the disparity between the cost of Chapter 1 services for private school children and for their public school counterparts. 966 F.2d at 1062. Noting that the court in *Pulido* had cautioned against "a comparison of per-pupil expenditures," 934 F.2d at 926; the court in *Barnes* held that the relative costs per student in a state-funded program must nevertheless be roughly proportional. 966 F.2d at 1063 (citing *Members of Jamestown School Comm. v. Schmidt*, 699 F.2d 1, 9 (1st Cir.), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983) (holding that the costs of busing sectarian and public school students must be roughly proportional)). The *Barnes* court observed that the First Amendment allows some degree of inequality in dollar amounts spent in the interest of achieving equality in the quality of services rendered, but held that the funding scheme cannot be "so grossly disproportionate" that it leads to political divisiveness along religious lines. 966 F.2d at 1063–64. The court applied the "grossly disproportionate test" by comparing the costs taken off the top in order to deliver services to parochial school students with the total Chapter 1 funds available. Because the "off the top" amount was only 2.7% of the total funds, the court upheld the allocation scheme. *Id.* at 1064–65.

The Seventh Circuit in *Alexander* and the Ninth Circuit in *Walker* also found that "off the top" allocations for the extra costs incurred in making comparable services available to private school children after *Aguilar* did not violate the Establishment Clause. The Seventh Circuit applied the *Lemon* test and concluded that the purpose of this practice was secular and that its effect was to neutrally provide remedial educational assis-

tance to all eligible schoolchildren. 983 F.2d at 752–54. The court also found that a disparity in delivery costs of constitutionally permissible services would not render a program unconstitutional, regardless of the extent of the disparity. *Id.* at 755 (citing *Mueller v. Allen*, 463 U.S. 388, 402, 103 S.Ct. 3062, 3070–71, 77 L.Ed.2d 721 (1983)).

In *Walker*, the Ninth Circuit followed the prior decisions in the Eighth, Sixth and Seventh Circuits, holding that the "off the top" method of financing mobile construction units was motivated by a secular purpose—the quest for comparable services—and was not so disproportionate as to be "merely a ruse to confer a benefit to the parochial school children." 46 F.3d at 1462–63 (citing *Jamestown School Comm.*, 699 F.2d at 10; *Barnes*, 966 F.2d at 1065–66, but distinguishing the holding in *Pulido*, 934 F.2d at 926). The *Walker* court found that only 5% of the total Chapter 1 budget was used for the provision of mobile classrooms, and it concluded that this was not a grossly disproportionate amount. 46 F.3d at 1463.[20]

### D. *The Alternative Plan's Purpose And Primary Effect*

█ In determining whether the Alternative Plan violates the Establishment Clause of the First Amendment, I apply the three-step inquiry set forth in *Lemon*. *Lemon* requires that a law have a secular purpose, no effect of advancing or inhibiting religion, and no entangling propensities in order for it to pass constitutional muster. 403 U.S. at 612–13, 91 S.Ct. at 2111.

█ In this case, plaintiffs have not adequately supported any contention they may have that the Alternative Plan is motivated by an improper purpose.[21] Indeed, it seems clear from the affidavits of the officials who have developed and implemented the Plan that its purpose, like that of the Chapter 1 program itself, is simply to assist in the

---

20. Plaintiffs in *Walker* also argued that the "off the top" allocation method effectively gives the private schools veto power over proposed Chapter 1 programs, which they use to control the type of Chapter 1 delivery systems to be used. 46 F.3d at 1461–62. The court rejected this argument as well.

21. Plaintiffs generally allege that the purpose of the Alternative Plan is to subsidize the religious schools so as to ensure their continued existence. Not only does Chapter 1 fail to effect a subsidy to sectarian enterprises, *see* discussion *infra*, but the plaintiffs have failed to support their allegation of improper purpose with any facts.

education of disadvantaged children. In *Bd. of Educ. v. Allen,* 392 U.S. at 243, 88 S.Ct. at 1926, and in *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111, the Supreme Court confirmed that if plaintiffs present no evidence which undermines the stated legislative purpose of a statute, that purpose is to be "accorded appropriate deference" by courts. The Court has consistently found that the purpose of providing remedial and special educational programs to all schoolchildren is a proper and secular one. *See, e.g., Wolman,* 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14.

Since the Alternative Plan has a secular purpose, I must next determine its primary effect. As discussed above, the Supreme Court has extensively examined the interaction between benefits to private schools and the requirements of the Establishment Clause. In order to uphold the Alternative Plan, there must be no effect of advancing or inhibiting religion. It is improper for a state to promote religious indoctrination or even to appear to do so. There are several ways in which a statute might have such improper effect. I will treat each potential impermissible effect separately.

### 1. *The Danger Of State–Funded Indoctrination*

The Supreme Court's Establishment Clause cases have affirmed and reaffirmed the proposition that there is nothing *per se* unconstitutional about the neutral provision of a benefit to religious schools. I find, as did the court in *Walker,* that "Chapter 1 services are a generally available benefit: they are provided to all educationally deprived children without regard to religion." *Walker,* 46 F.3d at 1459. As such, the provision of Chapter 1 benefits is only constitutionally problematic if the benefits can be put to a religious use. In *Grand Rapids,* 473 U.S. at 388, 105 S.Ct. at 3225, *Meek v. Pittenger,* 421 U.S. at 371, 95 S.Ct. at 1766, and *Lemon,* 403 U.S. at 618–19, 91 S.Ct. at 2113–14, the Supreme Court explained that the provision of public school teachers is constitutionally infirm only when the teachers are under the control of a religious institution or when they teach in a religious environment.

Remedial instruction in public schools is not subject to being used for religious indoctrination, even if the classes taught are composed solely of students of one religion. *Wolman,* 433 U.S. at 246–48, 97 S.Ct. at 2604–06. The Court has refused to hold that a religious student population could create an atmosphere that might pressure a teacher to conform his or her teaching to religious purposes. *Id.* at 248, 97 S.Ct. at 2605–06 (the dangers perceived in *Meek* arose from the nature of the institution, not from the nature of the pupils).

The teachers instructing in MIUs are not under the control or supervision of a religious school. Furthermore, the MIUs are not religious environments. They are labeled as property of the state. They contain no religious symbols of any kind. They are not located on the premises of religious schools. They are mobile and cannot be considered annexes to religious schools. They are not under the control of religious schools. The mere fact that Chapter 1 personnel assigned to an MIU might enter a sectarian school in between classes to use the restroom or lunchroom facilities does not convert the secular environment of the MIU into a religious atmosphere.

The case of Leased Sites is less clear, but the result is the same. Although a classroom may be leased by a state agency, it might still constitute a religious environment in certain circumstances. In *Grand Rapids,* the Court found that teachers instructing in a room leased inside a school that was owned and operated by a religious group and inhabited by religious teachers and administrators, whose professed goal was religious indoctrination, were subject to the kind of environmental pressures that could render their teaching in aid of religion. 473 U.S. at 386–87, 391, 105 S.Ct. at 3223–25, 3226. The sites leased under the Alternate Plan, however, are distinguishable from those leased in *Grand Rapids.* Although a majority of the sites leased by the New York City Board of Education are in buildings owned by a religious group, the buildings are not occupied by sectarian personnel; students must leave their school building to attend Chapter 1 classes; there are no religious classes inside

the buildings housing the Leased Sites; and the sites are free of all religious symbols. Under these circumstances, there is nothing that would render these sites sectarian environments, and this aspect of the plan is permissible.

The provision of computers inside the religious schools is likewise permissible. The fact that computers may be located inside a religious school does not taint their immutable instructional capacity. Like books, immutable secular goods can enter and be used for instruction in a sectarian school, since they are not subject to being used for religious indoctrination. *See Allen,* 392 U.S. at 244–46, 88 S.Ct. at 1926–28; *Wolman,* 433 U.S. at 241–44, 97 S.Ct. at 2601–04; *Meek,* 421 U.S. at 367, 95 S.Ct. at 1764. Significantly, the computers have been electronically and physically configured so as to limit their use to Board-sanctioned instruction. That technicians accompany the computer terminals into the private schools is of no constitutional consequence. The Supreme Court has dispelled any doubt over whether public employees are permitted to work in private schools. *Zobrest,* 509 U.S. at 12–14, 113 S.Ct. at 2469. Technicians are not teachers; they do not instruct. Their role is limited to servicing the machines and keeping order in the computer lab. Because of this role, technicians, like the diagnosticians who were permitted to work in private schools in *Wolman,* 433 U.S. at 244, 97 S.Ct. at 2603, are not subject to the religious pressures of sectarian schools. Indeed, their relationship with religious school students is not conducive to religious instruction even should the pervasively sectarian environment in which they work suggest that they act according to the particular religion involved. Put simply, there is no specifically religious way to turn computer terminals on and off.

2. *Symbolic Union—The Appearance Of State Support*

The Supreme Court has held that a statute or state practice can have the effect of aiding religion when it creates the appearance of joint government-religion action or authority. For example, in *Larkin v. Grendel's Den,* the Court found that allowing a religion to exert governmental power by exercising its discretion over which applicants could obtain liquor licenses created impermissible joint state-church power. 459 U.S. 116, 103 S.Ct. 505. The Court has also held that the establishment of a school district based on religious demographics similarly delegated state authority to religion and engendered the appearance that the church and state were aligned and united in a program of educating children according to religious concerns. *Bd. of Educ. of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). Similarly, in *Grand Rapids,* the Court held that public teachers' presence in the same halls and classrooms as religious teachers could reasonably foster an impression that the church and state were linked in a common effort to educate the students according to the religious schools' beliefs. 473 U.S. 373, 105 S.Ct. 3216. However, the Court has never held that the mere flow of financial aid to a religious institution or religious school students constituted a "symbolic link" between church and state.

On this subject, plaintiffs first suggest that the Alternative Plan created, in essence, a veto power for the religious schools, which amounts to an improper delegation of government authority to a religion. Plaintiffs assert that the private schools exercised this power to expand the use of MIUs and to limit the use of public school classrooms as Chapter 1 delivery sites. This argument was rejected in *Walker,* 46 F.3d at 1462 (citing *Wheeler,* 417 U.S. at 424, 94 S.Ct. at 2286–87), and I reject it here as well. It is the LEA that decides which delivery methods of Chapter 1 services will be employed, and there is no evidence that religious schools can or do exercise this authority in their place.

Plaintiffs next cite to *P.S. 16 v. Quinones,* 803 F.2d 1235 (2d Cir.1986), as support for their contention that the segregation of religious school students from public school students, be it in MIUs, Leased Sites, or even in public school classrooms, creates the appearance of state support of religion

and is therefore unconstitutional.[22] *P.S. 16* held that Chapter 1 classes held at a public school violated the Establishment Clause because the classes created the appearance of public endorsement of a specific religion. In that case, New York City, in an effort to attract Hasidic Jewish participants to a Chapter 1 program, created classrooms in a public school that comported to the Hasidic beliefs of separatism. The City isolated a set of classrooms in P.S. 16 by installing swinging doors and establishing classes behind those doors for eligible Hasidic girls. The Hasidic students were "assured that their Chapter 1 classes would be conducted separately from any such classes for the public school students," not because of any logistical difficulties, but in deference to the Hasidic doctrine of separation, which requires strict separation of Hasidics from the rest of society as well as the "separation of males and females for virtually every activity, including schooling." *Id.* at 1237. The City also assured the Hasidic students that all teachers would be Yiddish-speaking women. *Id.* The plan was a response to the fact that, without designing a program with these features, the Hasidic students "would refuse to attend remedial classes in P.S. 16 for religious reasons." *Id.*

The Second Circuit found that the special treatment of the religious school students, including the provision of Yiddish-speaking female teachers when requested, conferred upon the Hasidic students a benefit not available to other students. The court also held that this treatment, together with the "enforced physical separation" of Hasidic girls from public school students, created "at least the appearance that the City was endorsing the tenets of the Hasidic religious sect." *Id.* at 1238. Citing *Grand Rapids,* the court stated that a statute could have the impermissible effect of advancing religion merely by giving the appearance of government endorsement of religion. *Id.* at 1240–41. It is especially important, the court noted, to

guard against creating this type of "symbolic link" in the minds of "children of tender years." *Id.* at 1240. The court took care to distinguish the special nature of the separation involved in that case—Yiddish-speaking teachers, physical separation and segregation by gender according to religious beliefs—with other types of separate classes for private schoolchildren that did not involve the appearance of state endorsement of religion. *Id.* at 1241–42.

A similar analysis of the "symbolic link" created by a state practice was undertaken by the court in *Bollenbach v. Bd. of Educ. of Monroe–Woodbury Central School District,* 659 F.Supp. 1450 (S.D.N.Y.1987). The court held that the deliberate deployment of only male bus drivers on routes encompassing the village of Kiryas Joel, which was inhabited exclusively by Hasidic Jews, for an all-boys Hasidic private school had the primary effect of advancing religion. The decision to deploy only male drivers created the appearance of a joint church-state effort at keeping Hasidic boys isolated from females and promoted this tenet of the Hasidic faith. *Id.* at 1462–65.

In the instant case, plaintiffs contend that conducting classes composed only of private school students creates the same type of "symbolic link" as the challenged practices in *P.S. 16* and *Bollenbach.* However, there are significant differences between a program which happens to result in separate classes and one which deliberately sets up classes to accommodate the religious preferences of the private school students. This distinction was recognized by the Second Circuit in *P.S. 16,* 803 F.2d at 1241. Here, there is no indication that the logistically-motivated separate classes echo any religious tenets of the students involved. Although schoolchildren from schools for one gender necessarily attend Chapter 1 classes composed of students only of that gender under the Plan, there is no effort made to ensure that Chapter 1

---

22. Plaintiffs also argue that the government has effectively created separate educational facilities for students of different religions, violating the Equal Protection Clause in the same way that the segregated schools did in *Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). This position is frivolous. The government has

not separated students based on their religion. If students are educated separately, it was at their (or their parents') option, and it is constitutionally permissible to allow parents this option. *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Everson,* 330 U.S. at 18, 67 S.Ct. at 512–13.

personnel interacting with such students are of the same gender or otherwise meet special criteria that would perhaps be important from a religious point of view. (Weiss Decl., ¶ 134.) Some all-girls classes, for example, are attended to by male public employees. (Weiss Decl., ¶¶ 154–155.) There is also no construction of physical barriers to create a separate space in public schools in which private students are instructed. (Weiss Decl., ¶ 38.) Since, unlike in *P.S. 16*, the Alternative Plan does not cater to the religious beliefs of students, the mere fact that private school students do not receive Chapter 1 instruction together with public school students cannot be characterized as endorsing religious beliefs or creating an impermissible "symbolic link" between church and state.

 Plaintiffs contend that the fact that MIUs and computers used in CAI are provided by and belong to (or are leased by) the government creates the impression that the state is engaged in a joint enterprise with religious schools. I find, however, that the opposite is true. As the Court pointed out in *Bowen v. Kendrick*, 487 U.S. at 605, 108 S.Ct. at 2572, the fact that the government engages in some activities in conjunction with religious organizations does not create a "symbolic link" between church and state. In order for such an effect to be found, the activity must give the appearance of public endorsement or support for a religion or a religious tenet. Supplying vehicles or machines for use of children in obtaining remedial instruction, when such vehicles and machines are clearly not provided as a gift to the institution and the institution cannot make any other use of these vehicles and machines, avoids any impression that church and state are linked, symbolically or otherwise.

3. *Direct Aid To A Pervasively Sectarian Enterprise*

 A statute will create an impermissible effect if it directly subsidizes a pervasively sectarian enterprise. *See Meek*, 421 U.S. at 365–66, 95 S.Ct. at 1763–64. Subsidization occurs when (1) the state funds an aspect of the sectarian enterprise that the

sectarian enterprise otherwise would be financially responsible for, leaving the enterprise with extra funds to use for its own religious purposes; *Nyquist*, 413 U.S. 756, 93 S.Ct. 2955; *Sloan*, 413 U.S. 825, 93 S.Ct. 2982; or (2) "massive aid" flows directly to a pervasively sectarian enterprise. *Meek*, 421 U.S. 349, 95 S.Ct. 1753.

 Chapter 1 explicitly provides that federally funded remedial classes established under its authority must not supplant classes already provided by local schools and educational agencies. The Alternative Plan does not replace any programs for educationally disadvantaged schoolchildren. Unlike the program in *Grand Rapids*, the Alternative Plan provides only for special education classes for a small, identified segment of the student population. There is no danger that Chapter 1 classes could expand within this framework to take over the secular teaching function of religious schools. In addition, affidavits from religious school administrators affirm that Chapter 1 creates educational options for disadvantaged children that otherwise were not and would not be provided by the private schools. It is clear, therefore, that, unlike the programs in *Meek* and *Grand Rapids*, and like the program upheld in *Zobrest*, the Alternative Plan does not substitute state aid for religious school educational responsibilities.

 The Court in *Meek*, 421 U.S. at 362, 95 S.Ct. at 1761–62, and *Zobrest*, 509 U.S. at 12, 113 S.Ct. at 2469, distinguished between "direct" aid to a pervasively sectarian institution and an "indirect" benefit to such an institution accruing from a service provided to its students. *See also Everson*, 330 U.S. at 17–18, 67 S.Ct. at 512–13. The provision of Chapter 1 services to eligible students in programs placed outside of the religious schools directly aids the child, not the institution. The benefit to the religious schools in this case is even more indirect than was the benefit to such organizations in *Allen* or *Everson*. Since benefits are provided directly to students and do not supplant the religious schools' educational responsibilities, they do not constitute subsidies to and support of religion in violation of the Establishment

Clause. *Zobrest,* at 12, 113 S.Ct. at 2469; *see also Walker,* 46 F.3d at 1459, n. 8.

Plaintiffs' New York Constitutional challenges of the Chapter 1 program fail for the same reasons. The benefit of the remedial education accrues not to the religious schools but to eligible, educationally deprived students. The Alternative Plan, therefore, does not "support or maintain" any religious schools in violation of the New York Constitution.

 Finally, the mere payment of money to a religious institution as part of a commercial lease does not create an improper effect under the First Amendment. There is no effect of advancing religion by the government contracting with a sectarian organization unless there is some special benefit granted to the organization by virtue of the contract. There is no evidence in this case that the leasing at fair market rentals of sites owned by various sectarian groups created a special benefit for the religious organization.

### 4. *Non–Neutral Treatment Or Effect Of The Funding Scheme*

Plaintiffs contend that even if the Alternative Plan otherwise lacks the effect of advancing religion, the funding system supporting it is impermissible. Specifically, plaintiffs allege that the federally endorsed and state-mandated approach of special appropriations, or taking monies "off the top" to fund the costs of complying with *Aguilar,* unconstitutionally transfers more money per capita to religious school students and thereby advances religion. Thus, plaintiffs contend that the funding scheme behind the Alternative Plan should be struck down as either non-neutral in its treatment of religious school students or non-neutral in its effect of providing a relatively greater benefit on such students.

 As noted above, some circuits have applied a "grossly disproportionate" test to determine whether a disparity in costs and/or benefits is unconstitutional. In *Jamestown*

School Comm. v. Schmidt, the First Circuit held that when a statute results in an unequal provision of benefits, the benefit received by religious school children cannot be grossly disproportionate. 699 F.2d at 10–11. *Jamestown* applied this test by comparing the amount spent on busing per child under the challenged scheme. Two other circuits have agreed with the First Circuit that a disparity in benefits is constitutionally limited. *See Barnes,* 966 F.2d at 1062; *Walker,* 46 F.3d at 1463. This approach focuses on non-neutral effect and, relying on *Everson* and its extensive progeny, allows for a non-neutral effect, but attempts to set a limit on the size of the permissible disparity.

Both *Barnes* and *Walker* dealt with Chapter 1 plans which, like the one at issue here, provided that the cost of making the plan comport with the constraints of *Aguilar* were taken "off the top." In applying the grossly disproportionate test, both courts compared the "off the top" expenses to the total Chapter 1 allocation, and both concluded that the percentage of Chapter 1 funds used to bring the plans into compliance with *Aguilar* was not grossly disproportionate.

 Plaintiffs argue that, rather than comparing the compliance costs to overall Chapter 1 funds, the grossly disproportionate test requires a comparison between cost per religious school student and cost per public school student. The cost-per-student comparison was used in *Jamestown,* 699 F.2d at 10–11. The benefit of the busing plan involved in *Jamestown,* however, was the cost of transportation, and thus it was these relative costs which were compared. *Id.* In Chapter 1 cases, on the other hand, the actual benefit provided is the remedial education instruction—the costs of which are equal per child.[23] Since the costs per benefit received is equal, I conclude that the only legitimate point of contention is the cost of compliance with the Establishment Clause as a percentage of the total program. Since this cost does not translate into a benefit to the religious school children, it does not

---

**23.** I will not determine whether the instructional services provided according to the Alternative Plan to private schoolchildren are "equitable" or

"comparable" to public school students because in this case plaintiffs have no standing to assert a violation of 20 U.S.C. § 2727.

make sense to assess this cost on a per capita basis.

The *Barnes/Walker* method of assessing gross disproportionality here would counsel in favor of upholding the Alternative Plan. The costs of complying with First Amendment constraints, even if calculated inclusively as plaintiffs suggest, remains well below ten percent of the total Chapter 1 expenses. Such a disparity does not create a constitutional difficulty.[24]

However, some circuits have refused to apply the grossly disproportionate test to determine the constitutionality of Chapter 1 funding schemes. In *Pulido* and *Alexander*, the courts rejected it, reasoning that a statistical analysis should not be the determining factor between disparities that are and are not permitted under the Constitution. Instead, these cases concluded that if services were neutrally and generally provided, then any resulting disparity in costs, or even benefits, would be irrelevant. *Pulido*, 934 F.2d at 924; *Alexander*, 983 F.2d at 756–57.

Since the Chapter 1 program at issue here provides a general benefit—remedial educational services—to all children neutrally, under the *Pulido* and *Alexander* approach, any disparity in the costs of delivering this benefit to one child as opposed to another is constitutionally immaterial. Although I agree with the *Pullido/Alexander* approach, the Alternative Plan at issue here satisfies the "grossly disproportionate" test in any event.[25]

### E. The Plan's Potential For Excessive Entanglement

■■ Although excessive church-state entanglement may invalidate a statute, the law does not require "total separation." *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112. The character of the institution benefitted by a statute, the nature of the aid provided, and the resulting relationship between the government and the religious authority are relevant to determining whether excessive entanglement occurs. *Id.* at 615, 91 S.Ct. at 2112.

### 1. The Need For Supervision In A Religious Environment

■■■ The Supreme Court has consistently found parochial schools to be "religious environments." *See, e.g., Lemon*, 403 U.S. at 616, 91 S.Ct. at 2113. While public teachers working in a religious environment require supervision to ensure the secular content of their classes, their counterparts working in neutral environments do not. In addition, there is no constitutional difficulty involved when the state supervises public employees in public space. Thus, whether supervision of teachers working in public schools and MIUs occurs, or is even necessary, is constitutionally irrelevant. Since teachers working in the Leased Sites are not under the physical or administrative control of religious or religious school authorities, there is no potential for impermissible entanglement arising from their supervision by the government. Finally, there is no need to extensively supervise CAI technicians working in the private schools because their function cannot be employed for religious indoctrination. The mere presence of a public employee who is not a teacher in a private school does not create excessive entanglement. *Wolman*, 433 U.S. at 241–44, 97 S.Ct. at 2601–03; *Meek*, 421 U.S. at 367, 95 S.Ct. at 1764; *Zobrest*, 509 U.S. at 11, 113 S.Ct. at 2468.

### 2. Administrative Entanglement

The implementation of a successful Chapter 1 program necessarily involves at least some minimal degree of contact and coordination between public officials and the administration of the parochial school. The *Aguilar* decision found that the administrative contacts involved in providing services inside private schools created excessive church-state entanglement. The Court has

---

24. In addition, defendants note, the extra compliance costs have often not been taken "off the top," as the Board is permitted to do, but have been financed by other appropriations or covered by unspent portions of previous Chapter 1 funds.

25. Plaintiffs challenge the New York funding laws which provide for "off the top" funding in addition to the practice encouraged by federal regulations. The reasoning upholding the federal regulations is applicable to the state rules as well, and neither system creates a constitutional difficulty here.

stated, however, that it is neither possible nor required that the state be barred from all contact with religious organizations. The question is one of degree.

 *Jamestown* held that administrative contacts alone could not cause an otherwise constitutional statute to be struck down. 699 F.2d at 10. This seems especially true when the contacts are ministerial, and are not so extensive as to approach the type of joint enterprise that has been characterized as a "symbolic link." The Alternative Plan, as opposed to the previous Chapter 1 program, does not require teachers to coordinate classroom space and internal school procedures with religious school personnel. The types of administrative contact necessary under the current Plan do not advance a joint enterprise, but merely avoid unnecessary conflicts. This type of limited contact cannot be said to create excessive entanglement in violation of the Establishment Clause.

### 3. *Political Divisiveness*

Although *Lemon v. Kurtzman* identified a "broader base" of entanglement that could result from a statute's inspiration of political conflict along religious lines, *Lemon*, 403 U.S. at 622–23, 91 S.Ct. at 2115–16, the Court has made it clear that "political" entanglement alone will not invalidate a law or practice. *Lynch v. Donnelly*, 465 U.S. at 684, 104 S.Ct. at 1365; *Mueller v. Allen*, 463 U.S. at 403, n. 11, 103 S.Ct. at 3071, n. 11; *Bowen v. Kendrick*, 487 U.S. at 617, n. 14, 108 S.Ct. at 2578, n. 14; *see also Jamestown School Comm.*, 699 F.2d at 12. Although plaintiffs cite articles expressing public anger against the "symbolic link" that the *P.S. 16* case created, there is no evidence of mass dissension as a result of the implementation of the Alternative Plan as presently applied. Furthermore, the Establishment Clause "is not concerned with political divisiveness generally, but only with political divisiveness along religious lines." *Jamestown School Comm.*, 699 F.2d at 12; *see also Bollenbach*, 659 F.Supp. at 1461. Finally, even if plaintiffs had shown that such political divisiveness had or could occur as a result of the Plan, this alone cannot support a decision to strike down the program. *Nyquist*, 413 U.S. at 797–98, 93 S.Ct. at 2977–78.

### *CONCLUSION*

For the foregoing reasons, plaintiffs' motion for summary judgment is denied in its entirety. Defendants' and defendant-intervenors' motions for summary judgment are granted.

So Ordered.